No. 81-410

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

---

NEOMA THOMPSON,

Plaintiff and Appellant,

vs.

NEBRASKA MOBILE HOMES CORPORATION,
ARNOLD KRUSE, d/b/a AMERICAN IDEAL
HOMES; and JACK BOLES,

Defendants and Respondents.

---

Appeal from: District Court of the Eighth Judicial District,
In and for the County of Cascade
Honorable H. William Coder, Judge presiding.

Counsel of Record:

For Appellant:

Frisbee, Moore & Stufft, Cut Bank, Montana
David Stufft argued, Cut Bank, Montana

For Respondents:

Jardine, Stephenson, Blewett & Weaver, Great Falls,
Montana
Lon Holden argued, Great Falls, Montana

For Amicus Curiae:

Larsen & Neill, Great Falls, Montana
Dirk Larsen argued, Great Falls, Montana

---

Submitted: May 28, 1982

Decided: June 23, 1982

Filed JUN 23 1982

Thomas J. Kearney
Clerk

Mr. Justice Frank B. Morrison, Jr., delivered the Opinion of the Court.

Plaintiff, Neoma Thompson, appeals the decision of the Eighth Judicial District Court of Montana to dismiss her claim of strict liability in tort against defendants. It was dismissed because the only injury suffered by plaintiff was to the product itself, the mobile home. We reverse the decision of the District Court and hold that a strict liability action can lie when the only damage suffered is to the defective product itself.

Neoma Thompson purchased a 1972 Magnolia Futurama from Arnold Kruse, d/b/a American Ideal Homes, and Jack Boles on September 25, 1971. She paid $8,465.00 for the mobile home. It was designed and constructed by Nebraska Mobile Homes Corporation (Nebraska).

The purchase agreement contains the following language:

> "It is mutually agreed that the buyer takes the new mobile home, trailer or other described unit, 'as is' and that there are no warranties, either express or implied, made by the dealer. The seller specifically makes no warranty as to its merchantability or of its fitness for any purpose."

There was also a repair clause in the agreement whereby American Ideal Homes agreed "to return to service Thompson's home as required."

Regarding factory warranties, Mr. Thomas Wilson, Jr., General Manager of Nebraska Mobile Homes, stated at trial that every mobile home sold by Nebraska in 1971-72 had at least a 90 day warranty. Since some states required one year warranties, Wilson stated that it was his practice to honor all of Nebraska's warranties for one year.

Thompson's mobile home was delivered and set up on November 17, 1971. That night the furnace malfunctioned.

At Thompson's request and pursuant to the purchase agreement, American Ideal returned to Thompson's mobile home and repaired the furnace the next day. Within a month, Thompson noticed that several interlocking roof shingles had been blown from the roof. Again she phoned American Ideal, who delivered new shingles to Thompson. She then found a friend to replace the shingles and some roof batting for her. At an unspecified later date, a sliding glass door was also repaired by American Ideal.

Mrs. Thompson was injured in an automobile accident in 1966 and suffers memory loss. Although much of her memory has returned, she still has some problems. Therefore, Thompson's testimony is rather vague with respect to dates and time frames.

During the first winter she owned the Futurama, 1971-72, Thompson was plagued by cold air blowing through the home's outlets, cupboards and closets. She contacted American Ideal regarding this problem and was told a "factory man" (from Nebraska Mobile Homes) would be sent to repair the leaks. After several more calls to American Ideal and sometime during the next two years, 1973 or 1974, a factory man did visit Thompson at her home. He spent approximately 30 to 40 minutes at the mobile home and caulked her bedroom closet floorboard. He immediately left as he needed to return to Nebraska for his daughter's wedding. Thompson testified that she was unable to discuss with him other problems with her mobile home due to his quick departure.

The caulking was insufficient. Thompson found it necessary to install a gas heater as well as to purchase several electrical heaters in an effort to keep her home warm.

Sometime after the caulking was performed, Mrs. Thompson noticed that the living room ceiling was starting to sag. She called American Ideal Homes about the problem, to no avail.

On June 6, 1976, Mrs. Thompson saw Mr. Arnold Kruse installing another mobile home in her court. She went to that site and requested Kruse to come examine her sagging roof and ceiling. He did so. He testified at trial that the roof and ceiling were sagging approximately four inches and that the walls of the mobile home were bowed. He stated that he had never before seen a Magnolia in that kind of condition.

Mrs. Thompson is unclear about when she first noticed her ceiling was sagging. She testified at trial that it could have been a year or a year and a half after her bedroom was caulked. She also testified that it had been sagging for no less than one year and may be as much as two or three years prior to Mr. Kruse's visit. The exact time remains an open question of fact.

Mr. Kruse phoned Nebraska Mobile Homes on June 7, 1976, and requested someone come check the Thompson mobile home. In response to that call, Mr. Bill Boyer inspected Thompson's home in either June or July of 1976. He told Mrs. Thompson that he had never seen a Magnolia act that way and that he would call Thomas Wilson about the problem. Mr. Boyer later told Mrs. Thompson that Mr. Wilson stated there was nothing Nebraska could do as her one year warranty had expired.

Approximately one year later, September 1, 1977, Thompson filed a complaint against Nebraska Mobile Homes, Arnold Kruse, d/b/a American Ideal Homes and Jack Boles. The primary allegations in the complaint were:

(1)  That defendant Nebraska Mobile Homes had failed to use due care and had used inferior materials when constructing her home;

(2)  That such actions had resulted in the mobile home being in a defective condition when it was delivered to Mrs. Thompson; and

(3)  That the defects constituted breach of warranties that the home was suitable for Montana's severe winters and that the home was fit for general use.

The complaint was later amended to include a claim against defendants for damages, based on strict liability in tort.

A jury trial was held July 14, 1981.  On that same day, Nebraska filed a motion in limine prohibiting any testimony regarding plaintiff's physical or emotional sickness allegedly caused by the mobile home.  The motion was granted and there is no appeal of that issue.  At the close of the trial, both defendants moved for dismissal of plaintiff's claim for property damages based on strict liability in tort.  Plaintiff filed a brief in support of her claim, after which defendant's motions to dismiss were granted.

The case was submitted to the jury on negligence, fraud and warranty theories.  The jury was instructed by the judge that disclaimers are a defense to warranties.  Defendants were thus allowed to rely on Uniform Commercial Code defenses not available for strict liability claims.  The jury found for the defendants on all counts submitted to them.  The only issue raised in this appeal is whether the District Court erred in dismissing plaintiff's claim for strict liability in tort.

This Court adopted strict liability in tort in Brandenburger v. Toyota Motor Sales (1973), 162 Mont. 506, 513 P.2d 268.

We stated several reasons for so doing:

> (1) ". . . to place liability on the party primarily responsible for the injury occurring, that is, the manufacturer of the defective product."

> (2) To fulfill such public policy considerations for openly fixing responsibility on the manufacturer regardless of negligence as:

> (i) requiring the manufacturer to anticipate hazards and guard against their recurrence, as the consumer is not able to do so;

> (ii) placing the cost of injury on the manufacturer, who can cover the risk of injury through insurance, rather than overwhelming the injured consumer with that burden;

> (iii) discouraging the marketing of defective products; and

> (iv) placing responsibility on the retailer and wholesaler of the defective product as they act as a conduit through which liability may reach the manufacturer.

Strict liability in tort is defined in 2 Restatement of Torts Second, Section 402(A), as follows:

> "(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

> "(a) the seller is engaged in the business of selling such a product, and

> "(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it was sold.

> "(2) The rule stated in Subsection (1) applies although

> "(a) the seller has exercised all possible care in the preparation and sale of his product, and

> "(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

In _Brandenburger_, we adopted the above definition and held that a claim for strict liability in tort could lie whenever a defective product caused physical harm to its

-6-

consumer, or to the consumer's property. As the only physical harm caused by Mrs. Thompson's defective mobile home was to the mobile home itself, the District Court Judge dismissed Thompson's strict liability in tort claim.

We reverse the District Court's decision to dismiss the claim and remand this case for a new trial on the theory of strict liability in tort. By doing so, we extend the doctrine of strict liability in tort to include those instances where the only injury suffered is to the defective product itself.

The rationale quoted in Brandenburger also applies under these circumstances. The public remains in an unfair bargaining position as compared to the manufacturer. In the case of damage arising only out of loss of the product, this inequality in bargaining position becomes more pronounced. Warranties are easily disclaimed. Negligence is difficult, if not impossible, to prove. The consumer does not generally have large damages to attract the attention of lawyers who must handle these cases on a contingent fee. We feel that the consumer should be protected by affording a legal remedy which causes the manufacturer to bear the cost of its own defective products. By allowing a claim for strict liability in tort we are joining with the jurisdictions of New Jersey, Wisconsin, Michigan, Minnesota and Colorado in affording legal recourse to all victims damaged by defects resulting from the manufacturing process.

In Hiigel v. General Motors Corporation (Colo. 1975), 544 P.2d 983, Hiigel's motor home was damaged when its wheel studs sheared off, causing the dual rear wheels to separate from the vehicle while it was in operation. In extending strict liability in tort to cover damages to the motor home itself, the Colorado court stated: "Since under §402A the

-7-

burden of having cast a defective product into the stream of commerce falls upon the manufacturer, it appears inconsistent to limit his responsibility to property other than the product sold." Hiigel, 544 P.2d at 989.

Gautheir v. Mayo (Mich. 1977), 258 N.W.2d 748, involves a modular home rendered uninhabitable due to manufacturer created defects. In finding the manufacturer liable to the purchaser, the Michigan court enunciated the same "stream of commerce" rationale and held that "(a) consumer has a cause of action directly against a manufacturer for economic loss resulting from a defective product, when said defect is attributable to the manufacturer. . ." Gautheir, 258 N.W.2d at 749.

Santor v. A and M Karagheusian, Inc. (1965), 44 N.J. 52, 207 A.2d 305, is one of the first, as well as the best-reasoned, opinions in this area. In finding the manufacturer of a defective carpet liable to the purchaser for the value of the carpet when the defective condition was first discovered, the New Jersey court stated:

> ". . . the great mass of the purchasing public
> has neither adequate knowledge nor sufficient
> opportunity to determine if articles bought
> or used are defective. Obviously they must
> rely upon the skill, care and reputation of
> the maker. . . It must be said, therefore, that
> when the manufacturer presents his goods to
> the public for sale he accompanies them with
> a representation that they are suitable and
> safe for the intended use. . . The obliga-
> tion of the manufacturer thus becomes what in
> justice it ought to be -- an enterprise liability
> . . . The purpose of such liability is to insure
> that the cost of injuries or damages, either
> to the goods sold or to other property, result-
> ing from defective products, is borne by the
> makers of the products who put them in the
> channels of trade, rather than by the injured
> or damaged persons who ordinarily are power-
> less to protect themselves." Santor, 207 A.2d
> at 311, 312.

Other cases applying strict liability in tort to instances where the only injury is to the defective product itself are City of LaCrosse v. Schubert, Schroeder and Associates (1976), 72 Wis.2d 38, 240 N.W.2d 124; Superwood Corp. v. Siempelkamp Corp. (Minn. 1981), 311 N.W.2d 159; and C & S Fuel, Inc. v. Clark Equipment Co. (E.D. Ky. 1981), 524 F.Supp. 949.

Finally, respondent Nebraska Mobile Homes asserts that even if the District Court erred in dismissing the strict liability in tort claim, the error was harmless for two reasons:

(1) Implied warrantability of fitness for use is the same thing as strict liability. Since the jury returned a verdict for defendants on the warranty theory, they would have also done so on the theory of strict liability, had it been submitted to them.

(2) The Statute of Limitations for filing the strict liability in tort claim had run, thus barring that claim.

We disagree.

The court did instruct on the breach of implied warranty of fitness. However, the court also instructed that such a warranty could be disclaimed. The purchase agreement, as quoted at the outset of this opinion, disclaims the warranty. Therefore, the jury might well have determined that the disclaimer barred any action against defendant for a breach of an implied warranty of fitness for use.

Strict liability is not governed by the Uniform Commercial Code. It cannot be disclaimed. Therefore, the jury could logically have held for Mrs. Thompson under the strict

liability theory even though they held against her under the warranty theory. It was prejudicial error for the judge to fail to give the strict liability instruction.

The evidence of when Mrs. Thompson first discovered her ceiling to be defective is both inconsistent and unclear. It is a question of fact for the jury to determine. We cannot ascertain from the jury's general verdict whether or not they found the statute of limitations to have run. The applicable period of limitations is three years and commences to run from date of discovery, although the period may be further tolled by acts creating an estoppel. These are fact questions to be considered at a future trial with the defendant having the burden to prove this affirmative defense.

The decision of the District Court is reversed and this cause is remanded for a new trial on the theory of strict liability in tort.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____

_____
Justices