No. 88-87

IN THE SUPREME COURT OF THE STATE OF MONTANA

1989

---

NANCY PAPP, Individually and as
Personal Representative of the Estate
of ALEX PAPP,

    Plaintiff and Appellant,

  -vs-

ROCKY MOUNTAIN OIL AND MINERALS, INC.;
PETRO-LEWIS CORP., and PETRO-LEWIS FUNDS,
INC., and PARTNERSHIP PROPERTIES CO.;
BUCKEYE ENERGY CORP., and BALCRON OIL
COMPANY,

    Defendants and Respondents.

---

APPEAL FROM: District Court of the Thirteenth Judicial District,
      In and for the County of Yellowstone,
      The Honorable G. Todd Baugh, Judge presiding.

COUNSEL OF RECORD:

  For Appellant:

    Ugrin, Alexander, Zadick & Slovak; John D. Alexander and
    Neil E. Ugrin argued, Great Falls, Montana

  For Respondent:

    Moses Law Firm; Charles F. Moses, Billings, Montana
    Dorsey and Whitney; James L. Jones argued for Rocky
    Mountain Oil, Billings, Montana
    McNamer and Thompson, Mark S. Werner argued for Petro-
    Lewis, Billings, Montana
    Keefer, Roybal, Hanson, Stacey & Jarussi; Neil S.
    Keefer argued for Buckeye & Balcron, Billings, Montana

---

        Submitted: January 12, 1989

        Decided: March 2, 1989

Filed:

              Clerk

Mr. Chief Justice J. A. Turnage delivered the Opinion of the Court.

This is an appeal from an order of the Thirteenth Judicial District, Yellowstone County, granting summary judgment to respondents, Rocky Mountain Oil, Petro-Lewis Corporation, and Buckeye Energy Corporation. Appellant, Nancy Papp, brought suit in strict liability in tort and negligence for the wrongful death of her husband. Alex Papp died of lethal inhalation of hydrogen sulphide ($H_2S$) gas while working for Balcron Oil Company. Appellant claims the facility in which Papp was working and its components were defective and unreasonably dangerous. The court granted summary judgment in favor of defendants. We affirm.

The issues here are:

(1) Whether the District Court properly found that respondents were entitled to summary judgment as a matter of law on the grounds that the claim for strict liability does not fulfill the requirements of Restatement (Second) of Torts, section 402A.

(2) Whether the negligence issue must be dismissed on the grounds that the builders of the separator facility are too remote.

(3) Whether Buckeye Energy Corporation and Balcron Oil are joint venturers in the State B lease, thus immunizing Buckeye from appellant's negligence claim.

FACTS

In 1951, the State of Montana, State Board of Land Commissioners, entered into an oil and gas lease agreement with Phillips Petroleum Company and Ada Oil Company for property located southwest of Conrad, Montana. Known as the "State B" lease, it was assigned to Rocky Mountain Oil and Minerals, Inc. (Rocky Mountain) in August 1971. On September

2

1, 1978, Rocky Mountain sold its interest to the Petro-Lewis Corporation, Petro-Lewis Funds, Inc., and Partnership Properties Co. (Petro-Lewis), reserving a 50 percent interest in the leasehold estate. On October 4, 1981, Petro-Lewis sold by way of assignment, bill of sale, and conveyance, oil and gas leases in Pondera County, including the State B lease, to Buckeye Energy Corp. (Buckeye), who, in the same meeting, sold two-thirds interest in its Pondera County oil and gas leases to Balcron Oil Co. (Balcron).

In 1979, Alex Papp was hired by Balcron as an oil and gas pumper and worked for Balcron from 1979 until the date of his death, June 6, 1985. He spent up to 90 percent of his time in the gas fields and 10 percent working in the oil fields. On the State B lease southwest of Conrad was an oil "treater" or "separator" facility. The facility's purpose was to separate water and gas from the crude oil being pumped out of the ground. There are two tanks in the separator facility, the water knock-out tank and the gun barrel tank. An incoming flow line enters the facility from an underground pipe depositing oil into the knock-out tank. The tank separates salt water from the oil and allows hydrogen sulphide gas ($H_2S$) to separate from the crude oil and vent into the atmosphere. Once the initial impurities are separated and siphoned out, the oil is transferred to the gun barrel tank where it is heated to remove any remaining impurities. The treated oil is then put into storage.

Prior to the State B lease acquisition by Rocky Mountain, the treater facility had become worn from use. After the acquisition by Rocky Mountain, Rocky Mountain dismantled and rebuilt the facility and its components, completely enclosing it.

After Balcron took over the lease in 1985, it began replacing the flow pipes entering the facility. Balcron

replaced PVC pipe, which was unflexible and brittle, with a more flexible poly pipe. Alex Papp and Larry Ranney were assigned to complete an auxiliary flow line in the facility. On June 6, 1985, shortly after lunch, Papp and Ranney went to finish the flow line. Later that afternoon, Jerry Griggs, another employee of Balcron, went to the facility and found both men overcome by $H_2S$ inhalation.

Hydrogen sulphide is a deadly gas, exposure to which can quickly cause death. The building which houses the separator facility had at the time of Papp's death only one door for ingress and egress and no ventilation. There were no signs warning against the $H_2S$ gas. Both decedents were aware of the presence of $H_2S$ gas in the oil and at least some of its dangers. However, employees of Balcron were given no formal training concerning the dangers of $H_2S$ gas.

When Griggs arrived at the treater facility, Papp was found sitting against the east wall with his feet under the steel flow line. Larry Ranney was found twelve feet from Alex Papp against the inside west wall, with a wrench in his hand. Griggs realized that there was the presence of $H_2S$ gas in the air. Despite the presence of the gas, he went inside and pulled Alex Papp out. Another employee arrived and pulled out Larry Ranney.

Oil was steadily flowing out of the pipes into the facility and both Papp and Ranney were covered with dirt and oil which had apparently sprayed from a cracked PVC pipe.

After the deaths, employees of Balcron were given formal $H_2S$ training. Furthermore, changes in the treater facility were made. These included constructing an additional entrance for cross-ventilation, erecting warning signs of $H_2S$ gas, and finishing the replacement of the PVC pipe.

The Occupational Safety and Health Administration (OSHA) issued to Balcron Oil citations for violations of the

4

Occupational Safety and Health Act. Specifically, Balcron was cited for inadequate warning of $H_2S$ gas and for not providing respirators for the employees.

Decedent's wife, Nancy Papp, received workers' compensation benefits from the death of her husband, paid out by Balcron Oil. She later filed a complaint on behalf of herself and on behalf of the estate of Alex Papp, against Rocky Mountain, Petro-Lewis, Buckeye, and Balcron, alleging strict liability, negligence, and negligent failure to warn on the basis that the separator facility and its components were defective and unreasonably dangerous. After the defendants answered the complaint, plaintiff took the depositions of three of Papp's fellow employees and filed sets of interrogatories. In February, March, and April, 1987, defendants filed motions for summary judgment. Plaintiff thereafter moved to compel discovery, and filed briefs in opposition to the motions for summary judgment. On December 10, 1987, the District Court granted the motion for summary judgment on the grounds that no dispute as to material facts existed and that the defendants were entitled to summary judgment as a matter of law.

## DISCUSSION

The first issue is whether the District Court properly granted summary judgment on the grounds that appellant failed to show that the treater facility was within the Restatement (Second) of Torts, § 402A definition of "product."

## "PRODUCT" DEFINITION

The standard of review for granting or denying a motion for summary judgment is the same as that used by the trial court--that is, the moving party is entitled to judgment at law if there is no genuine issue of material fact and the

5

moving party is entitled to judgment as a matter of law. Rule 56(c), M.R.Civ.P.; Frigon v. Morrison-Maierle, Inc. (Mont. 1988), 760 P.2d 57, 45 St.Rep. 1344; Sevalstad v. Glaus (Mont. 1988), 737 P.2d 1147, 44 St. Rep 930; Kronen v. Richter (1984), 211 Mont. 288, 683 P.2d 1315; Reagan v. Union Oil Company of California (1984), 208 Mont. 1, 675 P.2d 953.

Appellant alleges that there are material facts in dispute--namely, whether the design and manufacture of the facility and its component parts were defective or whether it was negligent use or misuse of the equipment by Papp himself which caused his death. The reason for the death, according to appellant, was that the treater facility was defective and unreasonably dangerous. The facility lacked ventilation, there was insufficient ingress and egress, and there were no signs warning of the dangers of $H_2S$. Moreover, Papp had received no formal training regarding the dangers of the gas.

To prove that the respondents are liable under strict liability, appellant must demonstrate that the treater facility was a "product" within the § 402A definition, that this product was built and maintained by the respondents, and that the product was in a defective condition unreasonably dangerous. If the appellant is unable to show that the separator facility was a product, then § 402A is inapplicable to this case, and the summary judgment order will be affirmed. Respondents allege that the appellant has not met the requirements of the § 402A strict liability claim. To find strict liability of the seller of the facility, the facility and its component parts must be a "product" for § 402A purposes.

Restatement (Second) of Torts, § 402A states in pertinent part:

> (1) One who sells any product in a
> defective condition unreasonably

6

> dangerous to the user or consumer or to
> his property is subject to liability for
> physical harm thereby caused to the
> ultimate user or consumer, or to his
> property, if (a) the seller is engaged
> in the business of selling such a prod-
> uct . . .

From the time that the second Restatement was published in 1965, courts have struggled to find an all-inclusive defini-tion for the term "product." The Restatement writers them-selves began the list in the official comments following § 402A. The list included the sale of food for human con-sumption, or other products for intimate bodily use. The authors of the Restatement also embraced any product which reached the consumer or ultimate user in substantially the same condition in which it was intended, such as an automo-bile, an airplane, a grinding wheel, a water heater, a gas stove, a power tool, a riveting machine, a chair, or an insecticide. It also included any product which harmed the consumer's chattels or land.

Since 1965, the list has expanded tremendously and courts have adopted policy reasons for defining a product, rejecting a strict dictionary definition of the word "prod-uct." The social policy justifications for determining whether a "product" is found have been discussed by this Court in Brandenburger v. Toyota Motor Sales, U.S.A., Inc. (1973), 162 Mont. 506, 514-515, 513 P.2d 268, 273. The policy considerations applicable to the case at bar include:

> . . .

> (3) It is in the public interest to
> discourage the marketing of defective
> products;

> (4) It is in the public interest to
> place responsibility for injury upon the

manufacturer who was responsible for its reaching the market;

(5) That this responsibility should also be placed upon the retailer and wholesaler of the defective product in order that they may act as the conduit through which liability may flow to reach the manufacturer, where ultimate responsibility lies;

. . .

(7) That the consumer does not have the ability to investigate for himself the soundness of the product;

(8) That this consumer's vigilance has been lulled by advertising, marketing devices and trademarks.

See also: Lecherga, Inc. v. Montgomery (Ariz.App. 1970), 467 P.2d 256; Nalbandian v. Byron Jackson Pumps, Inc. (1965), 97 Ariz. 280, 399 P.2d 681; Greenman v. Yuba Power Products, Inc. (1962), 27 Cal.Rptr. 697, 377 P.2d 897; Escola v. Coca Cola Bottling Co. of Fresno (1944), 24 Cal.2d 453, 150 P.2d 436; "Products Liability Symposium: What is or is not a Product within the Meaning of Section 402A," 57 Marq. L. Rev. 623 (1974).

Therefore, courts analyzing a cause of injury to see if the injury-causing thing is a "product" within the confines of a strict liability definition for § 402A purposes, test the injury-causing thing against these preceding policy justifications. If it passes muster, it is then deemed to be a product.

In applying the policy justifications, most courts have refused to adopt the contention that a building is a "product." In Lowrie v. City of Evanston (Ill.App. 1977), 365 N.E.2d 923, decedent died from a fall in a parking garage. The Illinois Appellate Court held that neither the parking

ramp nor the parking space was a "product" within the product liability definition. In Trent v. Brasch Manufacturing Co., Inc. (Ill.App. 1 Dist. 1985), 477 N.E.2d 1312, the plaintiff was injured while "checking a thermostat" of the heating, ventilation, and air-conditioning system (HVAC) in a building. Defendants claimed that the HVAC was a component and indivisible part of the building. The court disagreed, reasoning that the HVAC was attached to real estate. The court applied the social policy considerations, ultimately sending the issue back to the trial court. See also: Immergluck v. Ridgeview House, Inc. (Ill.App. 1977), 368 N.E.2d 803 (in which a sheltered-care facility was held not to be a product); and Heller v. Cadral Corp. (Ill.App. 1980), 406 N.E.2d 88.

Other jurisdictions have also held that buildings are outside the scope of the "product" definition area. In Messier v. Association of Apartment Owners (Hawaii App. 1987), 735 P.2d 939, plaintiff was injured during a storm by an allegedly defective metal panel which dislodged from the roof of his condominium. The Hawaii court held that the condominium was not a product.

The Washington Appellate Court in Charlton v. Day Island Marina, Inc. (Wash.App. 1987), 732 P.2d 1008, held that a boathouse builder was not liable for the deaths of plaintiffs' decedents who died from carbon monoxide poisoning after being overcome by exhaust fumes caused by the boat's running engine within the boathouse. The plaintiffs claimed that there was inadequate ventilation in the boathouse. The court found that the plaintiffs failed to show that the boathouse was a product given its similarities with other buildings.

For more cases which regard buildings to be outside the purview of "products" for strict liability in tort, see:

9

McClanahan v. America Gilsonite Co. (D.C. Colo. 1980), 494 F.Supp. 1334; and K-Mart Corp. v. Midcon Realty Group of Connecticut, Ltd. (D.C. Conn. 1980), 489 F.Supp. 813.

A case which is nearly identical in terms of facts to the case at bar is Cox v. Shaffer (Pa.Super. 1973), 302 A.2d 457. In Cox, the decedent died by asphyxiation while working in a silo. The Pennsylvania court held that a silo constructed in place on an employer's land is not a product.

Some states have alternatively held that a building is a product within the scope of strict liability in tort, but only under limited circumstances. In 1965, the New Jersey Supreme Court was the first court to extend strict liability to home development in Schipper v. Levitt & Sons, Inc. (N.J. 1965), 207 A.2d 314. In Schipper, a child of plaintiffs was scalded by hot tap water and plaintiffs sued the builder-vendor for failure to install a mixing valve to reduce the water temperature after the water left the heating boiler. In holding the builder-vendor strictly liable, the court stated:

> When a vendee buys a development house from an advertised model, as in a Levitt or in a comparable project, he clearly relies on the skill of the developer and on its implied representations that the house will be erected in reasonably workmanlike manner and will be reasonably fit for habitation. He has no architect or other professional adviser of his own, he has no real competency to inspect on his own, his actual examination is, in the nature of things, largely superficial . . .

Schipper, 207 A.2d at 325. The court continued, saying that if injuries are the result of defective construction, the builder should bear the cost.

In 1969, California followed New Jersey in adopting strict liability for mass production and sale of tract homes in Kreigler v. Eichler Homes, Inc. (1969), 269 Cal.App.2d 224, 74 Cal.Rptr. 749. Defendant had constructed over 4000 homes in which steel tube radient systems had been installed in the concrete floor. Kreigler was injured when the floor collapsed from corrosion of the steel tubing. The California court, in holding defendant strictly liable, analogized mass-production of homes and mass-production of cars, stating that the buyer is not in a position to protect himself and that the policy reasons for "product" status were the same.

In Kanecko v. Hilo Coast Processing (Hawaii 1982), 654 P.2d 343, the Hawaii Supreme Court also held in favor of strict liability in cases of construction of prefabricated buildings. See also: Lantis v. Artec Industries, Inc. (7th Cir. 1981), 648 F.2d 1118.

An alternative view in a few states is that the home itself is not a "product" but that the component parts or additions to the building are "products" within the § 402A definition. In Philadelphia National Bank v. Dow Chemical Co. (E.D.Pa. 1985), 605 F.Supp 60, one of Dow's products, Sarabond, was a chemical in the mortar used in erecting plaintiff's bank building. The Sarabond corroded metals embedded in the mortar and brick panels of the building, causing structural damage. Defendants alleged that the mortar had become incorporated in the structure and indivisible from the building. The court rejected this argument holding that the Sarabond was a product and not part of the real property or a fixture thereto. In S.L Rowland Construction Co. v. St. Paul Fire and Marine Ins. Co. (Wash. 1967), 434 P.2d 725, the court held that in cases where an insurance policy limited liability in case of fire, the house itself

11

was not a product, but the component parts therein were products.

Another dimension of "product" definition was added by the Nevada Supreme Court in Elley v. Stephens (Nev. 1988), 760 P.2d 768. There, the Supreme Court of Nevada held:

> . . . even if we assumed, arguendo, that a prefab house is a product subject to the law of strict products liability, a strict liability theory is not applicable to an occasional seller of a product, who does not, in the regular course of his business, sell such a product. [Emphasis added.]

Elley, 760 P.2d at 771.

The foregoing discussion sets out the development of case law considering buildings in terms of "product" definition. In summary, a "product" is defined by policy considerations. Where a building is the alleged product, most jurisdictions do not subject defendants to strict liability scrutiny unless the homes are prefabricated and mass-produced and the defendants are in the business of constructing or selling these types of homes, thus eliminating the unique status of most buildings.


PRODUCT LIABILITY IN MONTANA

Strict liability is not new to Montana. Section 402A was first adopted in Brandenburger, in which we discussed the policy reasons for applying strict liability in tort. There are two decisions in Montana which are pertinent here. The first is Thompson v. Nebraska Mobile Home Corp. (1982), 198 Mont. 461, 647 P.2d 334; the second, McJunkin v. Kaufman (Mont. 1987) 748 P.2d 910, 44 St.Rep. 2111. In Thompson, the plaintiff complained of defects in her 1972 Magnolia Futurama Mobile Home, including loose shingles on the roof and poor seals in the corners of the home. We held that strict

12

liabilty was expanded to those instances where there is damage only to the defective product. Personal injury is not required.

In McJunkin, a K & B Mobile Home had numerous alleged defects shortly after the home was purchased. It was held that the plaintiff failed to show that the product was defective. We also held that the phrase "defective condition unreasonably dangerous" in § 402A is an indivisible requirement to be proved by the plaintiff. Defendants contended that the plaintiffs were required to prove that the mobile home was both in a defective condition and unreasonably dangerous.

Montana, however, has not addressed the initial question of whether the injury-causing thing is a product. We did not consider whether the mobile homes were "products" in Thompson or McJunkin, although, in the case of prefabricated homes and mobile homes which are mass-produced and sold in the stream of commerce, they may qualify as "products."

We hold that the summary judgment decision that the treater facility was not a "product" by the District Court must be upheld because:

(1) The respondents were not in the business of selling separator facilities as required by the Restatement;

(2) The alleged product did not reach the stream of commerce nor was the decedent a consumer as defined by the policy considerations in Brandenburger; and

(3) The treater facility, a building, is not a product.

Section 402A refers specifically to "one who sells a product in a defective condition," where the seller is engaged in the business of selling the product. The respondents here are not sellers of treater facilities. They engage in the business of extracting oil and gas for refinement. They are, therefore, not sellers within the § 402A

13

definition. This provision was incorporated in our statutes in 1987. See § 27-1-719, MCA.

In testing the alleged cause of death for "product" status, it is necessary to test the alleged product against the list of policy considerations. According to the policy considerations in Brandenburger, whether the product is in the stream of commerce is relevant. See also: Immergluck v. Ridgeview House, Inc. (Ill.App. 1977), 368 N.E.2d 803; Boddie v. Litton Unit Handling Systems (Ill.App. 1 Dist. 1983), 455 N.E.2d 142; Moorman Manufacturing Co. v. National Tank Co. (Ill.App. 1980), 414 N.E.2d 1302, rev'd in part, aff'd in part (1982), 435 N.E.2d 443. This is apparent in three specific policy considerations, i.e., the public interest in discouraging the marketing of defective products, the limitations and solicitations of the manufacturers to the purchaser of the product, and the ability of the consumer to inspect the product.

The separator facility did not enter the stream of commerce. It was part of the property passed from one lessee to another. The facility was not a product which was in the stream of commerce. Because Papp was not a "consumer," using the treater facility after it had reached the stream of commerce, there was no issue of disparity in bargaining power or a manufacturer's use of persuasive advertising or marketing devices to cause the consumer to buy the product. Moreover, no issue has arisen as to whether the decedent was able to inspect the facility. The treater facility is not a product under the widely used policy considerations.

A "product" is narrowly defined in the area of buildings, and the treater facility and the building which houses it do not fit within the definition prescribed by the Restatement. Leading cases have held that a building is not a "product," unless the building is mass-produced or

14

prefabricated. The separator facility is not mass-produced but is unique in nature. Considering that the structure which houses the separator facility is a building, the facility is not a "product" within a strict liability definition.

Other jurisdictions have held that components within a building are "products." However, even though the cracked PVC pipe is a component and is known to be brittle and of poorer quality than the poly pipe, it is not that component alone which caused the death here. The $H_2S$ gas leaking from the pipe was deadly because it was not allowed to evaporate into the atmosphere, but was confined within the housing structure. The building and its component parts are indivisible in this case. We hold that the building is not a "product" within the definition of § 402A of the Restatement.

## NEGLIGENCE

The second issue is whether the claim of negligence must be dismissed on the ground that the builders of the separator facility cannot be liable for negligence once they have sold the facility and released all control of it.

Appellant alleges that the respondents were negligent in their construction of the building and in their failure to warn decedent. Each of the defendants--Rocky Mountain, Petro-Lewis, Buckeye, and Balcron--denied liability, declaring instead that the decedent was negligent in misusing the components of the facility, specifically, putting too much strain on the PVC pipe while replacing it, causing the crack. Also, once the pipe had cracked, the decedents took improper steps in preventing the $H_2S$ gas from filling the facility and did not use caution to save themselves. Rocky Mountain and Petro-Lewis also blamed subsequent lessees for not properly inspecting and preventing any hazards.

15

Restatement (Second) of Torts, §§ 352 and 353, propose that liability of builders is terminated once they have relinquished ownership and control of the property. The California Supreme Court has addressed the issue of a former owner's liability in a negligence claim. In Isaacs v. Huntington Memorial Hospital (1985), 38 Cal.3d 112, 134, 695 P.2d 653, 664, the court stated that:

> [a] defendant cannot be held liable for the defective or dangerous condition of property which it did not own, possess, or control. Where the absence of ownership, possession, or control has been unequivocally established, summary judgment is proper.

Furthermore, in Preston v. Goldman (1986), 42 Cal.3d 108, 720 P.2d 476, in a case where a previous owner was sued for injuries to a child who fell in a pond built by the former owner, the court held that a former owner is not subject to liability for injuries sustained on the property long after he had relinquished ownership and control.

We apply the same reasoning here and hold that Rocky Mountain and Petro-Lewis are not liable to the appellant for decedent's death. They do not own, nor are they in possession of, the treater facility. Even as builders, the respondents should not be held responsible for reasons similar to the accepted "work rule doctrine." Once the builders finished the work on the facility and relinquished control of it to the subsequent owners, the subsequent owners accepted the property as finished. Therefore, the builders of the facility are not liable. Harrington v. LaBelle's of Colorado, Inc. (1988), 765 P.2d 732, 45 St.Rep. 2176.

16

JOINT VENTURE

The third issue is whether Buckeye is immune from negligence liability as a joint venturer with Balcron Oil.

Appellant was awarded workers' compensation benefits from Balcron. Pursuant to § 39-71-411, MCA (1985), if a claimant is awarded workers' compensation benefits, workers' compensation is the exclusive remedy, and employers are immune from further liability. If Buckeye and Balcron are joint venturers, Buckeye is an employer and is immune from negligence liability. Appellant claims that there is no joint venture and Buckeye is a separate owner and liable to appellant.

Buckeye and Balcron must meet the four elements of a joint venture, to qualify as joint venturers. They are as follows: 1) an express or implied agreement or contract creating the joint venture; 2) a common purpose among the parties; 3) community of interest; and 4) an equal right of control of the venture. Bender v. Bender (1965), 144 Mont. 470, 480, 397 P.2d 957, 962.

On October 26, 1984, Petro-Lewis sold its interest to Buckeye who sold two-thirds of its interest to Balcron Oil on the same day. The parties arranged an agreement which declared that Buckeye held a one-third investment interest and Balcron held a two-thirds operations interest. Information income tax returns are filed as a joint venture and their respective income taxes are calculated thereon. Buckeye reimbursed Balcron for one-third of the wages and workers' compensation insurance premiums.

We hold that the four elements have been met here. From the agreement between the parties, it can be discerned that they have entered into an agreement which created a joint venture. Co-ownership is not sufficient by itself to establish a joint venture, however. Sunbird Aviation, Inc.

17

v. Anderson (1982), 200 Mont. 438, 651 P.2d 622. The two companies have a common purpose, that being the financing and operation of oil fields. The operation of the State B lease also shows the community of interest between Buckeye and Balcron.

Appellant contends that the fourth element has not been met because Buckeye's two-thirds interest is not an equal share and they are not actively involved in the business affairs of the alleged venture. However, we have established that the parties can choose to delegate management duties to one venturer and still establish equal right of control. Murphy v. Redland, (1978), 178 Mont. 296, 583 P.2d 1049. Buckeye has sufficiently established that a joint venture is present.

Therefore, as a joint venturer with Balcron, Buckeye is an employer of the employees working in the State B lease oil and gas fields and is immune from negligence liability pursuant to § 39-71-411, MCA.

## CONCLUSION

The District Court found that because the § 402A requirements were not met and there were no material facts at issue, summary judgment would be granted in favor of respondents. We affirm the summary judgment decision. The treater facility is not a "product" and, therefore, strict liability is not applicable as a matter of law. Furthermore, Rocky Mountain and Petro-Lewis were not negligent at the time of decedent's death, and Buckeye, as an employer, is immune from negligence claims.

The appellant has failed to show that the treater facility was a product and concomitantly has failed to show any genuine issue of material fact. If the movant has met the initial burden of showing no genuine issue of material

18

fact, "it then shifts to the non-moving party to demonstrate a genuine issue of material fact." Gamble Robinson Co. v. Carousel Properties (1984), 212 Mont. 305, 312, 688 P.2d 283, 287; Frigon v. Morrison-Maierle, Inc. (Mont. 1988), 760 P.2d 57, 45 St.Rep. 1344. Appellant has failed to show a genuine issue of material fact regarding respondents Petro-Lewis and Rocky Mountain.

Moreover, appellant has failed to show any genuine issue of material fact that any of the respondents are liable in negligence. The District Court was correct in ordering summary judgment.

Affirmed.

_____
Chief Justice

We concur:

_____

_____

_____

_____

_____

_____
Justices

19