No. 92-278

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

---

ROBERT WIESNER and FRANK HARTMAN, JR.

       Plaintiffs and Appellants,

  -vs-

BBD PARTNERSHIP, a Montana general
partnership and DOUG FELLER,
RODGER WILSON, ROBERT TAYLOR,
and MELVIN McNEA, Individually,

       Defendants and Respondents.

---

APPEAL FROM:  District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable Robert W. Holmstrom, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

          Terry Spear; Matovich, Addy & Keller, Billings,
Montana

      For Respondents:

          Rodney T. Hartman; Herndon, Hartman, Sweeney &
Halverson, Billings, Montana

---

Submitted on Briefs:  October 29, 1992

Decided:  January 12, 1993

Filed:

FILED

JAN 12 1993

Ed Smith

CLERK OF SUPREME COURT
STATE OF MONTANA

_____
Clerk

Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal from a judgment entered after a non-jury trial in the Thirteenth Judicial District, Yellowstone County, the Honorable Robert W. Holmstrom presiding. The District Court found the parties to be joint venturers and denied appellants' claim for usury penalties. We affirm.

The dispositive issues on appeal are:

1. Did the District Court err in finding that the parties were involved in a joint venture?

2. Should the District Court have applied usury laws to this "transaction" whether or not it was a joint venture?

Appellants Frank Hartman, Jr. (Hartman) and Robert Wiesner (Wiesner) travelled to a Burlington Northern (BN) derailment near Ranchester, Wyoming, around February 2, 1988, to inspect the site for a possible bid on the salvage of nineteen railway cars of lumber. The lumber was to be cleared from the site and salvaged. Hartman had worked as a laborer on several salvage operations for BN but had never done a lumber salvage or bid on one himself. Wiesner had started his own business selling dimension lumber in 1982. Hartman was to provide the expertise necessary to do the actual clean up and salvage. Wiesner was to provide the expertise necessary to sell the salvaged lumber. They calculated a bid to present to BN. Although Hartman was aware that he would have to pay cash if his bid were accepted, he went ahead and submitted a bid of $113,663 even though he did not have the cash available. He submitted the bid on February 4, and it was accepted by BN around

2

3:00 p.m. that day. Payment was due by 5:00 p.m. the next day. Hartman and Wiesner exhausted their avenues of funding but were unable to obtain the necessary cash. On the evening of February 4, they asked Dave Anderson (Anderson), a business associate of Wiesner's, to obtain the funding if possible.

At approximately 9:00 p.m. that day, Anderson contacted Doug Feller (Feller), the managing partner of BBD Partnership (BBD), through the advice of another BBD partner, Mel McNea. Anderson explained what Hartman and Wiesner were trying to do and some of the figures they had calculated. Feller met the next morning with Hartman, Wiesner, and Anderson. They discussed the project further, and Feller contacted BN to confirm the details.

The four men negotiated an agreement under these urgent circumstances without the aid of legal counsel. The result was a document entitled simply "Agreement" which set forth the terms of the negotiations in rough detail. All four men contributed to the agreement and reviewed it before they signed the final draft around 4:00 that afternoon.

BBD did not have the $113,663 necessary to satisfy the bid and could not get that much from a commercial lender in time because it required the approval of a loan committee. Therefore, BBD borrowed $100,000 from an individual and the balance from a commercial lender. BBD paid the individual lender 12% interest and a $5,000 fee on the borrowed funds and paid the commercial lender 12% interest. Only BBD and its partners were liable for repaying these loans. BBD delivered a cashier's check directly to BN in time for

3

the 5:00 p.m. deadline. Neither Hartman, Wiesner, nor Anderson signed a promissory note to repay BBD the money. Nor did BBD obtain a security interest on any of their assets. Under the agreement, BBD was to receive 15% interest on the funds, a $27,500 fee, and 3% of the net profit.

Feller testified at trial that BBD would get involved only if it could own the lumber. However, BN required Hartman's name on the salvage contract because he submitted the bid. At the last minute Feller Associates, a sole proprietorship owned by Feller, was put on the bill of sale and the salvage contract along with Hartman Construction.

Wiesner eventually negotiated a deal with Fallow Forest Products (Fallow) to sell most of the lumber. Feller first learned of the deal when Fallow contacted him to determine where to wire the money. Testimony from Wiesner and Feller indicates that Fallow wanted to buy BBD out of the transaction completely and become a part of the transaction itself, which it eventually did, becoming a one-fourth partner. Fallow also wanted BBD to waive its claim to three percent of the profit in getting completely out. At that point Feller contacted his partners in BBD and recommended that they get out of the transaction because he saw friction developing between Hartman, Wiesner, and Anderson. Feller felt it would be in BBD's best interest to waive their share of the net profit and get out.

BBD waived its claim to a share of the profit when Fallow sent it a check for $143,000 on or around February 23. At that point,

the parties considered BBD's participation in the project complete.

Almost two years later, Hartman's attorney sent a letter to Feller asserting that the interest rate charged in this transaction exceeded the allowable rate under § 31-1-107, MCA (1987). Hartman, Wiesner, and Anderson then brought suit. Anderson assigned his interest in the suit to Hartman and Wiesner and was dismissed. The District Court found that the transaction involved here was not a loan from BBD, rather the parties were involved in a joint venture to which the usury laws did not apply.

I

Did the District Court err in finding that the parties were involved in a joint venture?

In reviewing the District Court's finding that the transaction amounted to a joint venture, we are guided by Rule 52(a), M.R.Civ.P., under which findings of fact are to be set aside only when they are clearly erroneous. This Court will uphold the lower court's findings where there is substantial credible evidence to support them even though the record contains evidence supporting contrary findings. Trad Indus., Ltd. v. Brogan (1991), 246 Mont. 439, 447, 805 P.2d 54, 59.

In its Findings of Fact, the District Court stated:

The Court finds that the transaction between the parties was not a loan but was in fact a joint venture wherein the parties pooled their respective assets and talents for the completion of a specified transaction, the salvage and sale of the lumber and agreed to divide between themselves the proceeds from the sale; that the actual performance of the venture, the salvage, the sale, the record keeping, was to be done by the members of the venture.

5

We have defined a joint venture as a "enterprise undertaken by several persons jointly, and more particularly, as an association of two or more persons to carry on a single business enterprise for profit. It has also been defined, somewhat variantly, as a special combination of persons undertaking jointly some specific adventure for profit." Sunbird Aviation, Inc. v. Anderson (1982), 200 Mont. 438, 444, 651 P.2d 622, 625 (quoting Rae v. Cameron (1941), 112 Mont. 159, 167, 114 P.2d 1060, 1064). It is essential that each party contribute property, money, skill, knowledge, or effort, although the contributions need not be equal or of the same character. Rae, 114 P.2d at 1064-1065.

In the Memorandum accompanying its Findings of Fact and Conclusions of Law, the District Court addressed the requisite elements of a joint venture and found that each had been satisfied. To qualify as a joint venture there must be: "1) an express or implied agreement or contract creating the joint venture; 2) a common purpose among the parties; 3) community of interest; and 4) an equal right of control of the venture." Papp v. Rocky Mtn. Oil & Minerals, Inc. (1989), 236 Mont. 330, 342, 769 P.2d 1249, 1257.

As to the first element, Hartman, Wiesner, Anderson, and Feller negotiated a deal and drafted a document they simply entitled "Agreement" without the aid of legal counsel and under the constraint of the 5:00 p.m. deadline. The document, though less than artfully drafted, purports to memorialize their agreement. It does contain what appear to be inconsistencies, but those do not warrant a reversal of the District Court's findings. See Trad

6

Indus., Ltd., 805 P.2d at 59. The first time the transaction is referred to it is referred to as "this joint venture" and the next two times it is referred to as "this venture." The use of the word "this" seems to make all parties to the agreement part of the joint venture.

The second requirement is that the parties share a common purpose. The purpose here was to salvage and resell the lumber for a profit. All parties were to receive a share of the net profit, albeit a small percentage for BBD.

The third element requires a community of interest. Each participant played a vital role in this project. Hartman had the expertise to salvage the lumber; Wiesner had the expertise to sell the lumber. Both of them were necessary in order to prepare a bid for the salvage project. Anderson became involved at their behest to acquire financing for the project. BBD became involved at Anderson's behest because it could provide the necessary venture capital. They were in this venture together, each providing a necessary element to ensure that the salvage project was completed.

The last element requires that the parties have an equal right of control. In this case, BBD requested ownership of the lumber as a condition of its participation. This was accomplished by putting the lumber in the name of Hartman Construction and Feller Associates jointly. BBD, through Feller, clearly had a right to control the sale of the lumber. The fact that appellants may have subverted that control by negotiating a sale in BBD's name without its authority does not diminish BBD's right to control. Further,

7

by the terms of the Agreement, Feller Associates was to be used for the accounting on this venture.

We hold that there was substantial credible evidence to support the District Court's finding that the parties were involved in a joint venture.

II

Should the District Court have applied usury law to this "transaction" whether or not it was a joint venture?

Appellants argue that joint venturers can loan money to the venture and that those loans are subject to usury laws. They cite Bennett v. Wise River Lumber Co. (1955), 129 Mont. 228, 284 P.2d 990, and Felska v. Goulding (1990), 245 Mont. 188, 800 P.2d 161, in support of their argument. We find Bennett inapplicable and Felska clearly distinguishable. The transactions in Felska were intended to be loans, clearly denominated as loans, and made after the initial investment capital was contributed to the venture in order to keep the venture afloat. Here, however, the transaction involved the initial venture capital for the salvage project.

The District Court noted that the parties had not called its attention to any "Montana cases wherein the Court was asked to determine whether an agreement, which provided for the payment of interest to one of the parties, was a loan or a joint venture agreement." It relied on Atkinson v. Wilcken (Cal. Dist. Ct. App. 1956), 298 P.2d 147, and Martter v. Byers (Cal. Dist. Ct. App. 1946), 171 P.2d 101, in determining that the usury laws did not apply. In Atkinson, the plaintiff owned dwelling units on which a

8

$4,000 balloon payment was past due resulting in foreclosure proceedings against the property. The defendant provided the $4,000 and required the plaintiff sign a $6,000 promissory note, a third trust deed, and a grant deed to the property. The plaintiff contended this was a loan. The defendant contended they were co-owners and were to share the profits from the sale of the property. The plaintiff claimed that defendant charged a usurious rate on the money. The court held that the parties were involved in a joint venture to which the giving of the note and security was "an incidental part of the entire transaction," and declined to find a usurious transaction. Atkinson, 298 P.2d at 149. In Martter, the court held that the usury laws did not apply to the transaction because it was a joint venture even though the agreement called for interest to be paid under certain circumstances. Martter, 171 P.2d at 107.

Based on these cases, the District Court concluded that "the fact of payment of interest and the agreement by Hartman, Anderson and Wiesner to 'personally guaranty BBD Partnership in this venture' were incidental parts of the transaction and therefore, not controlling." We agree.

Affirmed.

John Conway Harrison
Justice

We concur:

Chief Justice

9

_____
William C. Hunt

_____

_____
Justices

January 12, 1993

## CERTIFICATE OF SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:

Terry Spear
Matovich, Addy & keller
2812 First Ave. No.
Billings, MT   59101

Rodney T. Hartman
Herndon, Hartman, Sweeney & Halverson
P.O. Box 80270
Billings, MT   59108-0270

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: _____
Deputy