No. 96-099

IN THE SUPREME COURT OF THE STATE OF MONTANA

1997

BORDER STATES PAVING, INC.,
ECKART TRUCKING, INC., and
FISHER SAND & GRAVEL,

    Plaintiffs and Appellants,

    v.

THE STATE OF MONTANA, ACTING
THROUGH THE MONTANA DEPARTMENT
OF TRANSPORTATION,

    Defendant, Respondent and
    Cross-Appellant.

FILED

APR 15 1997

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    District Court of the First Judicial District,
    In and for the County of Lewis and Clark,
    The Honorable Dorothy McCarter, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Ronald G. Schmidt, Schmidt, Schroyer, Colwill & Moreno, Pierre, South
        Dakota; Patrick E. Melby, Luxan & Murfitt, Helena, Montana

    For Respondent:

        Stephen F. Garrison, Lyle Manley, Montana Department of Transportation,
        Helena, Montana

Submitted on Briefs: October 31, 1996

Decided: April 15, 1997

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1995 Internal Operating Rules, the following decision shall not be cited as precedent and shall be published by its filing as a public document with the Clerk of the Supreme Court and by a report of its result to State Reporter Publishing Company and West Publishing Company.

Appellants Border States Paving, Inc. (BSP), Eckart Trucking, Inc. (Eckart), and Fisher Sand & Gravel (Fisher) filed a complaint against the Montana Department of Transportation (MDT) over a project to reconstruct a portion of Interstate 90 within the Crow Indian Reservation. Appellants alleged damages of more than $2,000,000. The District Court for the First Judicial District, Lewis and Clark County, awarded damages to BSP in the amount of $5,634.75 and to Fisher in the amount of $11,000. BSP, Eckart and Fisher appeal this judgment along with several post-trial motions denied by the District Court. We affirm in part and remand in part.

Respondent MDT has consolidated Appellants' 11 lengthy and confusing issues into the following 8 issues, which we address on appeal:

1. Whether the District Court erred in holding that the Tribal Employment Rights Office (TERO) ordinance could be enforced by the Crow Tribe in this case.

2. Whether the District Court erred in ruling that the contractor had a duty to provide notice to MDT of Tribal interference.

2

3. Whether the District Court erred in ruling that MDT did not breach the implied covenant of good faith and fair dealing.

4. Whether the District Court denied Appellants' right to due process by adhering to a six-day trial schedule.

5. Whether the District Court erred in ruling that MDT's notice provision is not void, unenforceable, contrary to public policy, or unconscionable.

6. Whether the District Court erred in not reforming the contract to exclude the notice provision.

7. Whether the District Court erred in allowing MDT to introduce into evidence earlier versions of Appellants' claims.

8. Whether the District Court erred in not re-opening the trial for evidence on Appellants' claims of "unlitigated final quantities."

In addition, MDT presents the following issue on cross-appeal:

Whether the District Court erred by not ruling on the issue of Appellants' alleged violation of the False Claims Act, § 17-8-231, MCA.

**Factual and Procedural Background**

In 1990, MDT prepared plans for reconstruction of a portion of Interstate 90 within the Crow Indian Reservation. MDT solicited bids for the project and included within the bid package a "Notice" to all potential bidders which stated:

> For your information, some or all of this project will take place on the Crow
> Indian Reservation. The Crow Tribe has enacted an ordinance requiring all

3

employers subject to the Tribe's jurisdiction to give preference in training, employment, contracting and subcontracting to Indians. Contract fees may also be imposed. For more information about these requirements, contact: Crow TERO Office . . . .

Please note that the State is not a party to Indian preference or contract fee requirements. These are matters solely between the Tribe and the contractor. The State will not assist the Tribe to enforce these requirements, nor will it assist a contractor who has been charged by the Tribe with violating these requirements, nor will it consider requests for contract modifications to cover additional costs incurred because of such violations.

The ordinance referred to in the "Notice" required of any contractor coming onto the reservation that at least 95% of its workforce be made up of Crow Indians.

The I-90 project covered an area almost 8 miles long and required an extensive amount of hauling material to and from the site. The project included an area approximately 8500 feet long requiring excavation up to five feet deep. The excavated material was to be hauled away to a gravel pit and used as fill material, then new material hauled back to the site for placement. In addition, the old asphalt had to be "milled" off and hauled away to state stockpile areas. Hot bituminous pavement would then be hauled back to the site in preparation for paving.

BSP submitted the low bid and was awarded the contract in November 1990. BSP owned 9 trucks which it planned to use for hauling away the old asphalt milled off the site and hauling back the new material used to repave the road. BSP subcontracted with Eckart for an additional 9 trucks to haul the fill material back and forth from the excavation site with assurances of being able to get up to 18 trucks if desired or needed to expedite the job.

4

Substantial quantities of sand and gravel products were needed to complete the project so BSP subcontracted with Fisher who agreed to manufacture and furnish the materials to meet MDT specifications. Fisher was also dependent upon the availability of trucks to haul the sand and gravel to the site.

BSP began work on the project in April 1991. Eckart moved its trucks to the project by May 15, 1991, and contacted the TERO to send drivers for testing. Of the 13 drivers referred by TERO, Eckart hired only 2, complaining that of the 13 drivers tested, most could not shift gears or back up. On Tuesday, May 21, 1991, four trucks were required for hauling, so Eckart, without a full staff of Crow drivers, sent out four of its own drivers. The TERO threatened to fine Eckart $5,000 a day for not complying with the Tribe's hiring ordinance.

Eckart's trucks are valued at $50,000 each. Eckart was concerned about damage to the trucks resulting from operation by unqualified drivers, but offered to hire Crow drivers it felt were unqualified if the Tribe would assure Eckart that the Tribe would pay for any damage to the trucks caused by their drivers. The TERO refused and filed an action in Crow Tribal Court to enjoin Eckart from further work until it complied with the requirements of the ordinance. Bill Eckart later testified that he was afraid the Tribe might confiscate his trucks which were his only livelihood. Rather than comply with the ordinance, Eckart abandoned the job. Neither Eckart nor BSP apprised MDT of the problems Eckart was experiencing and MDT was not aware of them until after Eckart left the project.

BSP subsequently contracted with the Crow Tribal Council for trucking services. As of May 22, 1991, the Tribe did not have any trucks, mechanics, maintenance facilities or spare parts for trucks. The TERO bought four used trucks for use on the project. In the month it took the TERO to find and purchase these trucks, the loss of trucking impacted all other project work. In addition, the trucks furnished by the Tribe had a smaller load capacity than Eckart's trucks. Where Eckart could haul 27-28 tons per load, the Tribe's trucks could only haul 18-20 tons per load. Furthermore, where Eckart had subcontracted to furnish trucking at a rate of $52.96 per hour, the TERO subcontracted to furnish trucking at a rate of $68.75 per hour.

The shortage in trucking caused BSP to fall further and further behind on the project. Originally, BSP estimated that the project would begin in April 1991, and be completed by August 15, 1991, at the latest. After Eckart pulled out, BSP was forced to work up to 15 hours a day, 6 days a week to try to meet their schedule and complete the project.

On September 25, 1992, Appellants BSP, Eckart and Fisher sued MDT alleging, among other things, that MDT had breached its implied duty of good faith and fair dealing and that the "exculpatory" clause in the notice was void and unenforceable as it contravenes public policy and is unconscionable. Appellants alleged they were entitled to compensation for their extra costs amounting to more than $2,000,000.

A bench trial lasting 5 days was originally scheduled, but at a later scheduling conference, the time for trial was extended to 6 days. At the pre-trial hearing on the first day

6

of trial, the District Court Judge announced that the 6 days would be split into 3½ days for Appellants and 2½ days for MDT. The trial actually lasted 6½ days, with Appellants taking almost 4½ days. After trial, the court issued its Findings of Fact, Conclusions of Law and Order awarding damages to BSP in the amount of $5,634.75 and to Fisher in the amount of $11,000. Appellants filed several post-trial motions, which the District Court subsequently denied, including a motion requesting more time to present evidence. Appellants now appeal the District Court's judgment as well as the court's orders denying their motions. MDT cross- appeals contending that Appellants violated the False Claims Act, § 17-8-231, MCA.

## Standard of Review

We review a district court's findings of fact to determine whether they are clearly erroneous. Daines v. Knight (1995), 269 Mont. 320, 324, 888 P.2d 904, 906 (citing Columbia Grain Intern. v. Cereck (1993), 258 Mont. 414, 417, 852 P.2d 676, 678). We adopted a three part test in Interstate Production Credit Ass'n v. DeSaye (1991), 250 Mont. 320, 323, 820 P.2d 1285, 1287, to determine whether the findings are clearly erroneous. This test provides that we review the record to see if the findings are supported by substantial evidence. If they are supported by substantial evidence, we will determine if the trial court has misapprehended the effect of the evidence. If substantial evidence exists and the effect of the evidence has not been misapprehended, we may still hold that a finding is clearly erroneous, when, although there is evidence to support it, a review of the record leaves this Court with a definite and firm conviction that a mistake has been made.

7

In addition, we recently noted that it is within the province of the trier of fact to weigh the evidence and assess the credibility of witnesses and we will not second-guess those determinations. Rafanelli v. Dale (1996), 924 P.2d 242, 245, 53 St.Rep. 746, 748 (citing Double AA Corp. v. Newland & Co. (1995), 273 Mont. 486, 494, 905 P.2d 138, 142). We will uphold a district court's findings when there is substantial evidence to support them even when there is also evidence supporting contrary findings. Rafanelli, 924 P.2d at 246 (citing Wiesner v. BBD Partnership (1993), 256 Mont. 158, 161, 845 P.2d 120, 122).

Furthermore, we review a district court's conclusions of law to determine whether the court's interpretation of the law is correct. Carbon County v. Union Reserve Coal Co., Inc. (1995), 271 Mont. 459, 469, 898 P.2d 680, 686 (citing Steer, Inc. v. Department of Revenue (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603).

## Issue 1.

### Whether the District Court erred in holding that the TERO ordinance could be enforced by the Crow Tribe in this case.

Contrary to Appellants' contentions, the District Court did not rule on whether the TERO ordinance could be enforced in this case. Moreover, the District Court does not have jurisdiction to decide this issue. Issues dealing with jurisdiction of a Tribe within its boundaries must be litigated and exhausted in Tribal court before other courts may have jurisdiction. National Farmers Union Ins. Co. v. Crow Tribe (1985), 471 U.S. 845, 857, 105 S.Ct. 2447, 2454, 85 L.Ed.2d 818, 828; Wellman v. Chevron U.S.A., Inc. (1987), 815 F.2d 577, 578-79.

8

The TERO filed a complaint in Crow Tribal Court to enjoin Eckart from further work until it complied with the requirements of the ordinance. Rather than litigate the issue in Tribal Court, Eckart stipulated to dismissal of the action agreeing that it would do no further work on the Crow Indian Reservation without full compliance with TERO resolutions and procedures. Eckart failed to litigate the issue in Tribal Court and thus exhaust Tribal Court jurisdiction prior to filing the complaint in the instant case.

Moreover, BSP chose to bid for the project, knowing full well it would have to work on the Reservation and abide by the Tribe's ordinance, thus subjecting itself to Tribal Court jurisdiction. Besides the notice provision informing bidders of the TERO ordinance and directing bidders to contact the TERO to learn the requirements before they submitted bids, MDT Standard Specification 107.01 provided that anyone bidding on the project was required to keep informed of and comply with "all local laws, ordinances and regulations and all orders and decrees of bodies or tribunals having any jurisdiction or authority that affect those engaged or employed in the work or that affect the conduct of the work."

Eckart, as a subcontractor to BSP, agreed to "be bound to the Contractor by terms of the General Contract [and] to conform to and comply with all of the terms of the General Contract . . . ." Thus Eckart was also bound by MDT Standard Specification 107.01 and required to keep informed of and comply with "all local laws, ordinances and regulations."

### Issues 2 and 3.

**Whether the District Court erred in ruling that the contractor had a duty to provide notice to MDT of Tribal interference.**

9

**Whether the District Court erred in ruling that MDT did not breach the implied covenant of good faith and fair dealing.**

Appellants contend that MDT breached the implied covenant of good faith and fair dealing in not negotiating with the TERO in advance to define specific requirements for contractors and employers working on the reservation. The District Court found insufficient evidence to support a finding that MDT failed to act in good faith by refusing to assist Appellants in resolving their problems with TERO and concluded that MDT's failure to negotiate with the TERO did not constitute a breach of the implied covenant of good faith and fair dealing.

MDT had let several other projects on the Crow Indian Reservation in the past using the same notice provision. BSP had worked on some of these earlier projects without encountering any difficulties. On this occasion, neither Eckart nor BSP attempted to apprise MDT of the problems Eckart was having in working with the TERO to hire Crow drivers. MDT did not "refuse" to assist Appellants, as Appellants contend, because MDT was not aware of the problems until after Eckart had left the project. MDT cannot be expected to rectify a situation of which it was unaware.

Appellants also contend that the exculpatory clause in the notice provision clearly prohibited and precluded Appellants from notifying MDT of problems with the TERO. However, there is nothing in the clear language of the clause that states that MDT cannot be *notified* of problems with the TERO. Rather, the clause declares that the State will not assist

a contractor who has been "*charged* by the Tribe with *violating*" the ordinance. Accordingly, we affirm the District Court on these issues.

## Issue 4.

**Whether the District Court denied Appellants' right to due process by adhering to a six-day trial schedule.**

Appellants contend that the pre-determined limitation of 6 days of trial and the District Court's daily trial schedule denied Appellants' right to due process and the full and fair presentation of their case. MDT maintains that Appellants did not raise this issue until after the District Court had issued its Order adverse to Appellants.

On September 13, 1993, the District Court filed a Scheduling Minute Entry Order setting trial for August 15, 1994, and stating that the trial is anticipated to last 5 days. That trial date was later vacated and on August 18, 1994, the court filed another Scheduling Minute Entry Order setting a new trial date and stating that the trial is anticipated to last 6 days. Furthermore, in the District Court's February 15, 1995 Order, the court reiterates that trial will last no longer than 6 days. Nowhere in any of these orders does the court refer to any requests by Appellants' counsel for more time for trial or any objections by Appellants' counsel that the amount of time scheduled for trial was insufficient.

In their brief, Appellants refer to several instances during trial where both sides were hampered by time constraints, however, the record does not indicate any objections by Appellants to the 6-day trial schedule. We will not put a district court in error for a ruling or procedure in which the appellant acquiesced, participated, or to which the appellant made

11

no objection. State ex. rel. Ins. Fund v. Berg (1996), 927 P.2d 975, 983, 53 St.Rep. 1098, 1103 (citing In re Pedersen (1993), 261 Mont. 284, 287, 862 P.2d 411, 413). Therefore, we affirm the District Court on this issue.

## Issue 5.

**Whether the District Court erred in ruling that MDT's notice provision is not void, unenforceable, contrary to public policy, or unconscionable.**

Appellants contend that the notice provision violates §§ 28-2-701, 28-2-702 and 49-3-207, MCA, and is thus void and unlawful. The District Court concluded that MDT's notice provision is clear and unambiguous, is not unconscionable and is not a violation of the policies of law set forth in the code sections cited by Appellants. Those sections of the Montana Code provide:

**28-2-701. What is unlawful.** That is not lawful which is:
(1) contrary to an express provision of law;
(2) contrary to the policy of express law, though not expressly prohibited; or
(3) otherwise contrary to good morals.

**28-2-702. Contracts which violate policy of the law -- exemption from responsibility.** All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, for willful injury to the person or property of another, or for violation of law, whether willful or negligent, are against the policy of the law.

**49-3-207. Nondiscrimination provision in all public contracts.** Every state or local contract or subcontract for construction of public buildings or for other public work or for goods or services must contain a provision that all hiring must be on the basis of merit and qualifications and a provision that there may not be discrimination on the basis of race, color, religion, creed, political ideas, sex, age, marital status, physical or mental disability, or national origin by the persons performing the contract.

12

The general contract for this project did contain a provision as mandated by § 49-3-207, MCA. Appellants contend that the contract provision conflicts with the notice provision. However, as the District Court pointed out, these provisions are not inconsistent and do not constitute a basis for recovery in this action. The Tribal ordinance only authorizes the TERO to prohibit qualifications criteria. There is no evidence that the TERO exercised that authority. TERO officials testified at trial that their drivers were qualified to perform the work. Moreover, Appellants own witnesses admitted that nothing in the contract, including the notice provision, forced them to hire incapable or incompetent employees. Nothing in the contract prevented hiring on the basis of merit and qualification. Accordingly, we affirm the District Court on this issue.

## Issue 6.

**Whether the District Court erred in not reforming the contract to exclude the notice provision.**

Appellants contend that the contract should be revised to exclude the notice provision, pursuant to §§ 28-2-1611 and 1614, MCA, because the provision does not "truly express the intention of the parties . . . ." These sections of the Montana Code provide:

> **28-2-1611. When written contract may be revised by court.** When, through fraud or a mutual mistake of the parties or a mistake of one party while the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised on the application of a party aggrieved so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons in good faith and for value.

> **28-2-1614. Specific enforcement of revised contract.** A contract may be first revised and then specifically enforced.

13

There is no evidence that either party intended anything other than what the contract, including the notice provision, states. MDT sought bids on the project and the terms of the contract were clearly set forth to all interested bidders through the public bidding process. BSP bid on the project and the contract was let to BSP at the bid price.

There was no meeting of the minds that Appellants need not comply with Tribal ordinances and laws. The clear, unambiguous language of the notice provision reflects just the opposite. Moreover, revising the contract to delete the notice provision would place an additional financial obligation on the State which was not contracted for.

Appellants have failed to present any evidence of fraud or mistake that would require reformation of the contract. Accordingly, we affirm the District Court on this issue.

## Issue 7.

**Whether the District Court erred in allowing MDT to introduce into evidence earlier versions of Appellants' claims.**

Appellants contend that the District Court, over Appellants' objections, allowed MDT to introduce several superseded versions of Appellants' claims into evidence and that this was highly prejudicial and confusing to the court. Despite Appellants' claim, a review of the record reveals that while Appellants' counsel did question the relevancy of the earlier versions of the claims, he voiced no exception to the exhibit after it was admitted.

A district court has broad discretion to determine whether evidence is relevant and admissible, and absent a showing of abuse of discretion, the district court's determination will

not be overturned. Galbreath v. Golden Sunlight Mines, Inc. (1995), 270 Mont. 19, 22, 890 P.2d 382, 384. Appellants have failed to demonstrate that the District Court abused its discretion by admitting the superseded versions of Appellants' claims, thus we affirm the District Court on this issue. Appellants suggest that the numerous versions of the claim confused the judge, however, the transcript of the proceedings reveals that the judge expressed her confusion with these matters long before this information was offered or admitted.

## Issue 8.

### Whether the District Court erred in not re-opening the trial for evidence on Appellants' claims of "unlitigated final quantities."

Appellants moved the District Court pursuant to Rule 60(b)(3) and (6), M.R.Civ.P., for relief from the Judgment in order to present evidence on the issue of "unlitigated final quantities." Appellants contended in their motion that they reserved their rights during trial "to prosecute an additional claim should the parties fail to agree on the final quantities and payment due under the contract." The District Court denied Appellants' motion stating:

> The trial previously held in this matter adjudicated the merits of the claims before the Court. Nothing in the pretrial order or any other pleading presented to the Court indicated that the trial would be anything less. Although there was information presented to the Court that some of the contract costs were still being negotiated, counsel never indicated to the Court that the trial would not be a determination of the entire cause of action.

We find nothing in the record to contradict the District Court, thus we affirm the District Court on this issue.

15

**Whether the District Court erred by not ruling on the issue of Appellants' alleged violation of the False Claims Act, § 17-8-231, MCA.**

In its Amended Answer to Second Amended Complaint, filed December 19, 1994, MDT raised as its Eleventh Defense that Appellants' claims are "false, fictitious or fraudulent", thus Appellants have forfeited their claims under § 17-8-231, MCA, which provides:

> **Liability for false claims.** (1) A person who knowingly presents or causes to be presented a false, fictitious, or fraudulent claim for allowance or payment to any state agency or its contractors forfeits the claim, including any portion that may be legitimate, and in addition is subject to a penalty of not to exceed $2,000 plus double the damages sustained by the state as a result of the false claim, including all legal costs.
> (2) The forfeiture and the penalty may be sued for in the same suit.

MDT raised this issue again in its trial brief, however, the District Court failed to address the issue in its Findings of Fact, Conclusions of Law and Order.

Accordingly, we hold that the District Court erred by not ruling on the issue of Appellants' alleged violation of the False Claims Act, § 17-8-231, MCA, and we remand to the District Court for entry of a decision on this issue.

Affirmed in part and remanded in part for further proceedings consistent with this opinion.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices

17