STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Plaintiff-Appellant,

v.

FORD MOTOR COMPANY, Defendant-Respondent,

v.

NEENAH MENASHA FORD, ABC Company, a fictitious company, and ABC Insurance Company, a fictitious insurance company, Defendants.

Supreme Court

*No. 97–2594. Oral argument November 11, 1998.—Decided May 4, 1999.*

(Also reported in 592 N.W.2d 201.)

305

307

309

310

For the plaintiff there were briefs by *Patrick J. Coffey* and *Menn, Nelson, Sharratt, Teetaert & Beisenstein, Ltd.,* Appleton and oral argument by *Patrick J. Coffey.*

For the defendant respondent there was a brief by *Peter J. Hickey, Jeffrey T. DeMeuse* and *Everson, Whitney, Everson & Brehm,* Green Bay and *Karen Kies DeGrand, Mark M. Burden* and *Donohue, Brown, Mathewson & Smyth,* Chicago, IL and oral argument by *Terry E. Johnson* of *Peterson, Johnson & Murray, S.C.,* Milwaukee.

¶ 1. WILLIAM A. BABLITCH, J. It is established law in Wisconsin that the economic loss doctrine bars tort recovery for economic loss suffered by commercial entities. This case requires us to determine whether the economic loss doctrine also applies to consumer transactions. The circuit court concluded that the economic loss doctrine bars tort damages for purely economic losses in consumer transactions. State Farm Mutual Automobile Insurance Company (State Farm) requests that this court reverse the order of the circuit court entering summary judgment in favor of Ford Motor Company (Ford) on State Farm's negligence and strict liability claims to recover payments it made to its insured for an economic loss. Because we conclude that the same policies that justify applying the economic loss doctrine to commercial transactions apply with equal force to consumer transactions, we hold that the economic loss doctrine applies to consumer transactions and bars State Farm's tort claims for purely

economic loss. Therefore, we affirm the circuit court's order entering summary judgment in favor of Ford.

¶ 2. For purposes of this appeal, the facts are not in dispute. In 1992 James Renberg (Renberg) purchased a used 1990 Ford Bronco 4x4 "as is" from Neenah-Menasha Ford, a Ford dealership. Along with the vehicle, Renberg purchased an extended service warranty from Ford for the vehicle. Renberg also insured the vehicle with State Farm.

¶ 3. On July 31, 1996, Renberg drove his 1990 Ford Bronco to work. At the end of his shift, Renberg approached his vehicle to find that a fire had occurred within the vehicle although the vehicle was still locked and the windows were rolled up. Unfortunately for Renberg, his extended service warranty had expired. Renberg filed a claim with his insurance company, State Farm. State Farm conducted an investigation of Renberg's claim and concluded that the fire in Renberg's vehicle was caused by a defective ignition switch. On August 8, 1996, State Farm paid $11,602.40 pursuant to its contract of insurance with Renberg, an amount which represented the fair market value of the vehicle.

¶ 4. In September 1996, Renberg received a recall notice from Ford stating that 1988 through 1991 model Bronco and F-series trucks could develop a short circuit in the ignition switch, causing overheating, smoke and possibly fire in the steering column. The recall notice stated that the short circuit could develop when the vehicle was in use or unattended.

¶ 5. State Farm was notified of this recall notice and thereafter initiated this subrogation action against Ford to recover money it had paid to its insured, Renberg. State Farm based its action on theories of negligence, strict liability and breach of contractual

312

duties including express and implied warranties. State Farm later voluntarily dismissed its contractual causes of action because the sales contract for the vehicle was "as is" and the extended service warranty had expired at the time of the fire.

¶ 6. In its answer Ford raised the economic loss doctrine as an affirmative defense, asserting that the doctrine bars State Farm's tort claims of negligence and strict liability. Ford also moved for summary judgment.

¶ 7. The Outagamie County Circuit Court, the Honorable Dee R. Dyer presiding, granted Ford's motion for summary judgment, agreeing that the economic loss doctrine barred State Farm's tort claims.

¶ 8. State Farm appealed. The court of appeals certified the appeal to this court pursuant to Wis. Stat. § (Rule) 809.61 (1993–94),[1] and this court accepted the certification.

¶ 9. State Farm's claim to recover the payment it made for damage only to the Ford Bronco was based on theories of negligence and strict liability. The issue presented by this case, and as certified by the court of appeals, is whether the economic loss doctrine applies to consumer transactions[2] to bar tort recovery for

---

[1] All references to the Wisconsin Statutes are to the 1993–94 version unless otherwise indicated.

[2] Neither party argues that the transaction at issue in this case is not a consumer transaction. "Consumer transaction" is defined as "a transaction in which one or more of the parties is a customer for purposes of that transaction." Wis. Stat. § 421.301(13). "Customer" in turn is defined as "a person other than an organization (s. 421.301(28)) who seeks or acquires real or personal property, services, money or credit for personal, family, household or agricultural purposes." Wis. Stat. § 421.301(17).

purely economic loss. In other words, we must determine whether State Farm may rely on tort theories to recover damages resulting from a defect that causes harm only to the product itself. We conclude that the economic loss doctrine applies to consumer transactions. Therefore, State Farm's tort claims for purely economic loss are barred.

¶ 10. The question of whether the economic loss doctrine applies to consumer transactions, given the undisputed facts presented by this case, is a question of law that this court reviews de novo. *Sunnyslope Grading v. Miller, Bradford & Risberg, Inc.*, 148 Wis. 2d 910, 915, 437 N.W.2d 213 (1989) (citing *First Nat. Leasing Corp. v. Madison*, 81 Wis. 2d 205, 208, 260 N.W.2d 251 (1977)).

¶ 11. Economic loss is "the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold." *Northridge Co. v. W.R. Grace & Co.*, 162 Wis. 2d 918, 925–26, 471 N.W.2d 171 (1991) (citing Comment, *Manufacturers' Liability to Remote Purchasers for "Economic Loss" Damages—Tort or Contract?*, 114 U. Pa. L. Rev. 539, 541 (1966)). *See also, Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 216 Wis. 2d 395, 401, 573 N.W.2d 842 (1998). Economic loss has also been defined as "damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property . . . ." Note, *Economic Loss in Products Liability Jurisprudence*, 66 Colum. L. Rev. 917, 918 (1966). *See also Daanen*, 216 Wis. 2d at 401.

¶ 12. Because economic losses are those associated with a defective product or a product that does not meet a purchaser's expectations, causing damages that are meant to be addressed through the law of contract and warranties, Wisconsin has joined a majority of jurisdictions which have held that in the commercial transaction setting, damages for economic losses are recoverable only in contract and not in tort. *See Sunnyslope*, 148 Wis. 2d at 921. This rule has become known as the "economic loss doctrine." "The economic loss doctrine is a judicially created doctrine providing that a commercial purchaser of a product cannot recover from a manufacturer, under tort theories of negligence or strict products liability, damages that are solely 'economic' in nature." *Daanen*, 216 Wis. 2d at 400.

¶ 13. Three policies support applying the economic loss doctrine to commercial transactions: 1) it maintains the historical distinction between tort and contract law; 2) it protects parties' freedom to allocate economic risk by contract; and 3) it encourages the party best situated to assess the risk of economic loss, usually the purchaser, to assume, allocate or insure against that risk. *Daanen*, 216 Wis. 2d at 403. Our review of these policies convinces us that each policy applies with equal force to consumer transactions.

¶ 14. The first and most compelling policy supporting application of the economic loss doctrine to commercial transactions is that it maintains the distinction between tort and contract law. *Daanen*, 216 Wis. 2d at 403. It is important to maintain this distinction because the two theories serve very different purposes.

315

¶ 15. "Tort law is rooted in the concept of protecting society as a whole from physical harm to person or property." *Daanen*, 216 Wis. 2d at 405 (citing *East River S.S. Corp. v. Transamerica Delaval*, 476 U.S. 858, 866 (1986), and Keeton, *Prosser and Keeton on Torts* § 1 (5th ed. 1984)). *See also Northridge*, 162 Wis. 2d at 933. "It is society's interest in human life, health, and safety that demands protection against defective products, and imposes a duty upon manufacturers of those products." *Daanen*, 216 Wis. 2d at 405 (citing *Northridge*, 162 Wis. 2d at 933). Tort law was designed to protect people from unexpected losses that amount to an overwhelming misfortune that a person may be unprepared to meet. *East River*, 476 U.S. at 871 (citing *Escola v. Coca Cola Bottling Co.*, 150 P.2d 436, 441 (Cal. 1944) (concurring op.)). *See also* Christopher Scott D'Angelo, *The Economic Loss Doctrine: Saving Contract Warranty Law from Drowning in a Sea of Torts*, 26 U. Tol. L. Rev. 591, 594 (1995). "The manufacturer is deemed best able to bear the cost of such unexpected personal injury or property damage since, at least in theory, it can spread its loss throughout society in the form of higher prices." 26 U. Tol. L. Rev. at 594 (referring to *East River*, 476 U.S. at 872). Tort extends to all reasonably foreseeable parties; it may encompass unforeseen damages as well as those reasonably contemplated because it is circumscribed only by proximate cause. Note, 66 Colum. L. Rev. at 947. Tort law provides redress for safety hazards, *Northridge*, 162 Wis. 2d at 934, and embodies risk sharing, *id.* at 938.

¶ 16. Contract law, on the other hand, is based on obligations imposed by bargain, and it allows parties to

protect themselves through bargaining. *Daanen*, 216 Wis. 2d at 403; *Northridge*, 162 Wis. 2d at 938; David B. Gaebler, *Negligence, Economic Loss, and the U.C.C.*, 61 Ind. L.J. 593, 593 (Fall 1986) (referring to *Tort Theories in Computer Litigation*, 38 Rec. A.B. City N.Y. 426, 437 (1983); Keeton, *Prosser and Keeton on Torts* 655, 656; J. Dooley, *Modern Tort Law* § 2.06, at 13–14 (1977); G. Gilmore, *The Death of Contract* 87–90 (1974); S. Speiser, C. Krause & A. Gans, *The American Law of Torts* § 1.20 (1983); Bertschy, *Negligent Performance of Service Contracts and the Economic Loss Doctrine*, 17 J. Mar. L. Rev. 249 (1984)). "The law of contracts is designed to effectuate exchanges and to protect the expectancy interest of parties to private bargained-for agreements." *Daanen*, 216 Wis. 2d at 404 (citing 1 E. Allen Farnsworth, *Contracts* § 1.3 at 10–11 (1990)). A party to a contract voluntarily assumes a duty to perform a promise. *Daanen*, 216 Wis. 2d at 404 n.4 (quoting 1 Thomas M. Cooley, *A Treatise on the Law of Torts*, § 2 (4th ed. 1932)). The law of contracts seeks to hold parties to their promises, ensuring that each party receives the benefit of his or her bargain. *Daanen*, 216 Wis. 2d at 404.

■

¶ 17. Recovery under contract is limited to the parties to the contract or those for whose benefit the contract was made. Note, 66 Colum. L. Rev. at 947. Damages are limited to those reasonably contemplated by the parties when the contract was made. *Id.* Contract law provides redress for defects in suitability and quality of a product. *Northridge*, 162 Wis. 2d at 934. "Warranty law permits recovery of economic damages and makes the plaintiff whole by providing recovery for the costs of repair and/or replacement of the product and any consequent loss of profits, thus putting the

plaintiff into the position he would have been in had the product functioned properly." 26 U. Tol. L. Rev. at 594 (referring to *East River*, 476 U.S. at 872–73) (footnotes omitted).

¶ 18. Throughout legal history, courts have struggled to find the appropriate boundary between tort and contract. *See generally* William Lloyd Prosser, *The Borderland of Tort and Contract*, in Selected Topics on the Law of Torts 380, 380 (The Thomas M. Cooley Lectures, Fourth Series, University of Michigan 1953). This boundary has fluctuated with societal pressures. For example, early in legal history, parties relied on the strict "forms of action" rather than a distinction between tort and contract. *Id.* at 380–81; *Prosser & Keeton on Torts* § 6 at 28. However, there were occasions where the gravamen of the action prevailed over the form of the action. Prosser at 437. This "gravamen of the action" approach led to the modern distinction between tort and contract law.

¶ 19. As society became more industrial, it needed to address the influx of mass-produced products reaching the market place, some of which were defective. Initially it was thought "necessary to protect struggling and unstable industry against an onslaught of disastrous claims." *Dippel v. Sciano*, 37 Wis. 2d 443, 450, 155 N.W.2d 55 (1967). Courts protected manufacturers from liability by requiring privity of contract between the manufacturer and ultimate purchaser. *See id.* Protecting the development of industry took precedence over protecting injured plaintiffs. *Id.* (referring to *Winterbottom v. Wright*, 10 M. & W. 109, 152 Eng. Rep. 402 (1842)).

¶ 20. However, at least by the mid-1960's society had "long since passed from the unsure days of industrial revolution to a settled and affluent society where

we must be concerned about the just claims of the injured and hapless user or consumer of industrial products." *Dippel*, 37 Wis. 2d at 450. Thus the boundary between tort and contract law began to move in the direction of protecting purchasers. Strict liability developed as a totally separate area of recovery for such injured purchasers, aimed at recovery for physical injury to both person and other property. *Seely v. White Motor Company*, 403 P.2d 145, 149, 152 (Cal. 1965) (citations omitted). Imposing strict liability on manufacturers for defective products grew out of a "public policy judgment that people needed more protection from dangerous products than is afforded by the law of warranty." *East River*, 476 U.S. at 866 (citing *Seely*, 403 P.2d at 149).

¶ 21. Wisconsin first adopted the rule of strict products tort liability in 1967, specifically adopting the Restatement (Second) Torts § 402A. *Dippel*, 37 Wis. 2d at 459. " 'One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property . . . .' " *Id.* (quoting Restatement (Second) Torts § 402A). Strict liability law rests on the idea that the cost of physical injury to person or other property may be an " 'overwhelming misfortune to the person injured, and a needless one, for the risk of injury can be insured by the manufacturer and distributed among the public as a cost of doing business.' " *Seely*, 403 P.2d at 151 (quoting *Escola*, 150 P.2d at 436 (concurring op.)).

¶ 22. Products liability law was designed to govern the distinct problem of physical injuries resulting from a defective product; it was not designed to undermine contract law or the warranty provisions of the

Uniform Commercial Code (U.C.C.). *Seely*, 403 P.2d at 149. The law of contract and warranty has its own function. "The law of warranty 'grew as a branch of the law of commercial transactions and was primarily aimed at controlling the commercial aspects of these transactions.'" *Seely*, 403 P.2d at 150 (citing James, *Products Liability*, 34 Tex. L. Rev. 192; Llewellyn, *On Warranty of Quality, and Society*, 36 Colum. L. Rev. 341). The rules of warranty determine the quality of the product promised by the manufacturer and the quality it must deliver. *Seely*, 403 P.2d at 150. When a product does not function as warranted by the manufacturer, that is the manufacturer fails in its end of the bargain, the purchaser may recover contract damages.

¶ 23. With the acceptance of products liability law, commercial plaintiffs, appreciating the advantages provided by tort law, continued to push the boundary between tort and contract law by filing claims under tort theories of products liability and negligence where their only damages were economic loss; that is, where the defective product caused no personal injury or damage to other property but only damage to itself. *See, e.g., Sunnyslope*, 148 Wis. 2d at 914–15; *East River*, 476 U.S. at 861.

¶ 24. "It is clear...that if [strict products liability law] development were allowed to progress too far, contract law would drown in a sea of tort." *East River*, 476 U.S. at 866 (citing G. Gilmore, *The Death of Contract* 87–94 (1974)). It was perceived that plaintiffs were attempting to move the boundary between tort and contract too far. Thus, the dawn of the economic loss doctrine. The economic loss doctrine was developed and applied largely as a response to attempts to extend products liability law too far and into the unintended realm of economic loss.

¶ 25. The economic loss doctrine maintains the distinction between tort and contract. It recognizes that whether a product meets a certain level of performance or a purchaser's expectations is not a matter of societal interest. Rather, the specific functions of a product are a matter of contract. A manufacturer "cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands." *Seely*, 403 P.2d at 151. Therefore, "contract law. . .is better suited than tort law for dealing with purely economic loss in the commercial arena." *Daanen*, 216 Wis. 2d at 404 (citations omitted). Contract law permits the parties to specify the terms of their bargain and to protect themselves from commercial risk. Parties use the rules of warranty and contract to "determine the quality of the product the manufacturer promises and thereby determine the quality [the manufacturer] must deliver." *Seely*, 403 P.2d at 150.

¶ 26. If a plaintiff could recover tort damages for purely economic loss, "the manufacturer would be liable even though it did not agree that [the product] would perform as plaintiff wished or expected it to do." *Seely*, 403 P.2d at 150. Society's interest in tort law in protecting purchasers from the overwhelming misfortune attendant with physical injury does not justify "requiring the consuming public to pay more for their products so that a manufacturer can insure against the possibility that some of his products will not meet the business needs of some of his [or her] customers." *Id.* at 151.

¶ 27. The United States Supreme Court, along with a majority of other courts readily adopted the economic loss doctrine for commercial transactions to

321

bar tort recovery for purely economic loss. *See East River*, 476 U.S. at 868 (citing *Seely*, 403 P.2d at 145; *Jones & Laughlin Steel Corp. v. Johns-Manville Sales Corp.*, 626 F.2d, 280, 287 and n.13 (3rd Cir. 1980) (citing cases)).[3] "[A] commercial buyer seeking damages

---

[3] *See also Exxon Shipping Co. v. Pacific Resources, Inc.*, 835 F. Supp. 1195 (D. Haw. 1993) (doctrine precluded tort recovery for damage to bus caused by fire); *Bowling Green Mun. Utils. V. Thomasson Lumber Co.*, 902 F. Supp. 134 (W.D. Ky. 1995) (applying Kentucky law) (doctrine barred tort recovery for damage to utility poles); *ERA Helicopters, Inc. v. Bell Helicopter Textron, Inc.*, 696 F. Supp. 1096 (E.D. La. 1987) (applying Louisiana law) (doctrine precluded recovery for damage resulting from helicopter's defective engine component); *Nelson v. Todd's Ltd.*, 426 N.W.2d 120 (Iowa 1988) (doctrine applied to preclude tort recovery to butcher for spoiled meat caused by defective meat curing agent); *Oceanside at Pine Point Condominium Owners Ass'n v. Peachtree Coors, Inc.*, 659 A.2d 267 (Me. 1995) (doctrine precluded recovery for water damage caused by allegedly defective windows); *FMR Corp. v. Boston Edison Co.*, 613 N.E.2d 902 (Mass. 1993) (doctrine precluded tort recovery when power outages caused economic losses); *National Union Fire Ins. Co. of Pittsburgh, Pa. V. Pratt & Whitney Canada*, 815 P.2d 601 (Nev. 1991) (doctrine precluded tort recovery when airplane engine failed and destroyed entire airplane (may be sudden and calamitous case); *Lempke v. Dagenais*, 547 A.2d 290 (N.H. 1988) (doctrine precluded recovery for damages to garage); *Chemtrol Adhesives, Inc. v. American Mfrs. Mut. Ins. Co.*, 537 N.E.2d 624 (Ohio 1989) (economic loss doctrine barred tort recovery where dryer, used in manufacturing setting, malfunctioned and damaged only the dryer); *Waggoner v. Town & Country Mobile Homes, Inc.*, 808 P.2d 649 (Okla. 1990) (doctrine applied to bar tort recovery where defect to mobile home caused damage to only the home itself); *Boston Inv. Property v. E.W. Burman, Inc.*, 658 A.2d 515 (R.I. 1995) (doctrine barred recovery for economic damage caused by general contractor); *City of Lennox v. Mitek Indus., Inc.*, 519 N.W.2d 330 (S.D. 1994) (doctrine barred tort

for economic loss resulting from the purchase of defective goods may recover. . .under the U.C.C., but not in strict liability or negligence." *Spring Motors Distributors v. Ford Motor Co.*, 489 A.2d 660, 663, 672 (N.J. 1985).

¶ 28. Wisconsin has similarly followed *East River* and the majority of courts across the country in applying the economic loss doctrine to commercial transactions and barring tort recovery for purely economic loss in commercial transactions. *See Daanen*, 216 Wis. 2d at 400 ("even in the absence of privity, the economic loss doctrine bars a remote commercial purchaser from recovering economic losses from a manufacturer under tort theories of strict liability and negligence."); *Northridge*, 162 Wis. 2d at 938 (court recognized economic loss doctrine but allowed plaintiffs to recover tort damages for harm caused by asbestos); *Sunnyslope*, 148 Wis. 2d at 921 ("a commercial purchaser of a product cannot recover solely economic losses from the manufacturer under negligence or strict liability theories, particularly, as here, where the warranty given by the manufacturer specifi-

recovery for losses caused by defective building trusses); *Mid-Continent Aircraft Corp. v. Curry County Spraying Serv., Inc.*, 572 S.W.2d 308 (Tex. 1978) (doctrine applied to bar tort recovery where defective crankshaft forced airplane to land on rough road, causing damage to its fuselage and wings; implied doctrine is limited to transactions between commercial entities); *Maack v. Resource Design & Constr.*, 875 P.2d 570 (Utah Ct. App. 1994) (doctrine barred tort recovery damage to residence caused by water leakage); *Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.*, 374 S.E.2d 55 (Va. 1988) (doctrine barred tort recovery for damage to foundation of house caused by leaking swimming pool).

cally precludes the recovery of such damages."); *D'Huyvetter v. A.O. Smith Harvestore*, 164 Wis. 2d 306, 328, 330, 475 N.W.2d 587 (Ct. App. 1991) (affirmed summary judgment for defendants on strict liability and negligence claims because the plaintiff's damages stemmed from the failure of the product to perform as expected); and *Spychalla Farms v. Hopkins Agr. Chem.*, 151 Wis. 2d 431, 444 N.W.2d 743 (Ct. App. 1989) (allowed tort damages because the defective product caused physical damage to other property).

> Recovery for economic loss is intended to protect purchasers from losses suffered because a product failed in its intended [or expected] use. Recovery for economic loss necessarily focuses on the bargain struck between the parties; warranty law is premised on protection of the bargain. Economic loss is defined, as we stated previously, as damages for inadequate value, because the product is inferior and does not work for the general purpose for which it was manufactured or sold. Liability for economic loss is based on express or implied representations manifesting the manufacturer's or seller's intent to guarantee the product. Prosser and Keeton on Torts, secs. 95–95A, p. 677 (5th ed. 1984).

*Northridge*, 162 Wis. 2d at 933–34. *See also Sunnyslope*, 148 Wis. 2d at 920–21.

¶ 29. We conclude that the policy of maintaining the distinction between tort and contract applies with equal force to consumer transactions. As discussed above, it is well-established that a manufacturer has no duty to another commercial entity to prevent a product from injuring itself. *Daanen*, 216 Wis. 2d at 406. *See also East River*, 476 U.S. at 871. However, there is no principled reason to hold that same manufacturer to

324

a different standard when it sells its product to an individual consumer. Whether the purchase is a commercial or consumer transaction, the specific functions of the product are a matter of contract. Whether a commercial or consumer transaction, the specific functions of the product and the purchaser's expectations are "the meat and drink of contract law." Edward T. O'Donnell, et al., *On the Differences Between Blood and Red Ink: A Second Look at the Policy Arguments for the Abrogation of the Economic Loss Rule in Consumer Litigation*, 19 Nova L. Rev. 923, 944 (Spring, 1995). Just as contract law allows commercial parties to bargain and protect themselves from risk, so too does contract law allow consumer parties to protect themselves. Contract law most appropriately enforces the duties that the parties imposed upon themselves by entering into contracts. Whether in a commercial or consumer context, the distinction between tort and contract should not be eroded.

¶ 30. In this case, Renberg purchased the Bronco "as is," an agreement which likely affected the price of the vehicle. Ford did not warrant that it would be free from defects, such as a faulty ignition switch. Renberg also purchased an extended service warranty which provided certain protections for a certain price. Were Renberg or State Farm, as his insurer, allowed to recover tort damages for purely economic loss—the very type of loss meant to be covered by these contracts—the contracts would be rendered meaningless. Ford would be liable though it did not agree that the Bronco would perform as Renberg expected or wished, and though the service warranty had expired. "The manufacturer would be liable for damages of unknown and unlimited scope." *Seely*, 403 P.2d at 150–51.

¶ 31. This case illustrates that plaintiffs, still appreciating the "more congenial environment," provided to consumers by tort law, *Spring Motors*, 489 A.2d at 668, continue to push the boundary between tort and contract by filing tort actions for purely economic loss. However, whether a consumer or commercial plaintiff, if tort law were allowed to provide tort relief for purely economic loss, contract law would drown in a sea of tort. *See East River*, 476 U.S. at 866. Because tort and contract serve entirely different purposes, maintaining the distinction between the two theories is important, whether in commercial or consumer transactions.[4]

---

[4] The dissent argues that the economic loss doctrine should not apply in this case because the defective product, the Ford Bronco, posed an unreasonable danger to person and property. Dissent at 349–50. The dissent asserts that society should be protected from the risk of such defective products through strict products liability law even when the loss is only economic.

We respectfully disagree.

The dissent's concern regarding safety was recently addressed by the Illinois Supreme Court. *Trans States Airlines v. Pratt & Whitney Canada*, 682 N.E.2d 45, 53 (Ill. 1997). The *Trans State* court applied the economic loss doctrine over concerns regarding safety for two reasons. First, when a product damages only itself, the very harm meant to be addressed by products liability law is not realized. *Id.* "Thus, products liability safety concerns are not compromised." *Id.* Second, despite applying the economic loss doctrine to situations in which there is damage only to the product itself, strict liability and negligence law nonetheless continue to adequately protect damage to other property and personal injury. *Id.*

> Where the product causes personal injury or other property damage, the manufacturer may yet be subject to liability in tort. Because no manufacturer can predict with any certainty that the damage his unsafe product causes will be confined to the product

¶ 32. The second policy supporting application of the economic loss doctrine in the commercial setting is that it protects parties' freedom to allocate economic risk by contract. *Daanen*, 216 Wis. 2d at 403. As we stated earlier, economic loss is loss suffered in the value of a product because it is defective; that is, it is of inferior quality and it does not work for the purposes for which it was manufactured and sold. *Northridge*, 162 Wis. 2d at 925–26. Economic risk is the risk that such a loss might occur.

¶ 33. "Contract law, the law of warranty and the Uniform Commercial Code are designed to allow the parties to allocate the risk of product failure." *Sunnyslope*, 148 Wis. 2d at 920–21. Parties can set the terms of their agreements, *East River*, 476 U.S. at 872–73, and thereby contract regarding product performance and the purchaser's expectations. The U.C.C. allows manufacturers to limit liability by disclaiming warranties or restricting remedies, in which case the purchaser pays less for the product. *East River*, 476 U.S. at 873. Contract law also provides built-in limitations, derived from the parties' bargain. *Id.* at 874. For example, consequential damages such as lost profits, must be a foreseeable result of a breach of the contract. *Id.* (citing *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng. Rep. 145 (1854)). "Courts should assume that parties factor risk

---

itself, tort liability will continue to loom as a possibility. Therefore, in our view, the incentive to build safe products is not diminished.

*Id.* We agree with the reasoning of the Illinois Supreme Court. The looming and unpredictable threat of tort liability for personal injury and damage to other property caused by a defective product continues as an incentive to manufacturers to produce safe products.

allocation into their agreements . . . ." *Daanen*, 216 Wis. 2d at 408 (citation omitted).

¶ 34. Although society, through products liability law, has imposed a duty on manufacturers to protect against the risk of foreseeable personal injury or property damage, "it is more difficult for that manufacturer to assess a commercial purchaser's disappointed economic expectations." *Daanen*, 216 Wis. 2d at 410. This is particularly true when the purchaser does not inform the manufacturer of his or her specific expectations. *See Seely*, 403 P.2d at 150. Although a manufacturer cannot predict failures as its product is used by a purchaser, it is able to limit risk by contract. *Daanen*, 216 Wis. 2d at 411–12. "Forcing commercial parties to negotiate and allocate risk gives manufacturers certainty in pricing goods, since they can more reliably predict future liability and potential damages." *Id.* at 412 (citing *East River*, 476 U.S. 873).

¶ 35. Allowing tort recovery for economic loss would render contractual protections a nullity and destroy any freedom to allocate economic risk by contract. "[M]anufacturers, in effect, would be deprived of their freedom to negotiate, allocate, and limit liability." *Daanen*, 216 Wis. 2d at 408 (citing Note, 66 Colum. L. Rev. at 962). Purchasers would essentially receive full warranty protections against economic risk without ever having to negotiate or pay for such warranty. *See Daanen*, 216 Wis. 2d at 410. Purchasers would be encouraged to forego purchasing a warranty or insurance and would instead rely on tort remedies for their "warranty" protection against economic risk. *Daanen*, 216 Wis. 2d at 408 (citing *Dakota Gasification Co. v. Pascoe Bldg. Sys.*, 91 F.3d 1094, 1100 (8th Cir. 1996)).

Purchasers would gain much more than that for which they bargained or paid in the purchase price. *Daanen*, 216 Wis. 2d at 409.

¶ 36. If tort damages were allowed for economic loss the manufacturer would be liable for risks for which it neither bargained nor expected. *Daanen*, 216 Wis. 2d at 410–11. *See also Sunnyslope*, 148 Wis. 2d at 921; *Seely*, 403 P.2d at 150–51. Manufacturers could not invoke any contractual disclaimer or limitation of liability against the purchaser, as bargained. For example, in *Seely*, the manufacturer, White Motor Company, could have sold the truck "as is" and accordingly, not made any promises regarding the function of the truck. If tort law applied to economic loss, such an attempt to limit liability (for which the purchaser would probably pay a lower price), would be meaningless. If tort damages were allowed for the purchaser's economic loss, though the manufacturer sold the product "as is," the purchaser would recover anyway; the manufacturer would bear the entire risk of economic loss. *See Daanen*, 216 Wis. 2d at 407 (citing Note, 66 Colum. L. Rev. at 965).

¶ 37. Reliance on the economic loss doctrine, however, allows and protects both the manufacturer's and purchaser's freedom to allocate economic risk by contract. *See Daanen*, 216 Wis. 2d at 407. The economic loss doctrine encourages parties "to negotiate for warranty protection or to take steps, such as purchasing insurance, to protect their purely economic interests." *Id.* at 413. It is more appropriate to enforce a bargain than to allow an end run around a contract by using tort principles. *Id.* at 407. Subject to requirements of good faith and conscionability, manufacturers can

include disclaimers and limit their liability. In exchange, purchasers might pay a lower price. *See id.* at 407–08; Wis. Stat. § 402.719(3). The economic loss doctrine holds parties to their bargain. There is "no reason to intrude into the parties' allocations of the risk of economic loss and to extricate the parties from their bargains." *Daanen,* 216 Wis. 2d at 410.

¶ 38. The policy of protecting commercial parties' freedom to allocate economic risk by contract applies with equal force to consumer transactions. In the present case the parties allocated the risk of product failure. Renberg purchased the Ford Bronco "as is" according to the contract of sale. Ford made no promises regarding the vehicle's performance and Renberg likely paid less than he would have were it guaranteed. Renberg also purchased an extended warranty. He paid a certain price in exchange for the protections provided by the warranty. With both the contract of sale and the extended service warranty, Renberg received a certain level of protection against economic loss in exchange for a certain price. He also assumed some amount of economic risk. Had he been willing to pay more, he could have received additional protections.

¶ 39. Were Renberg or State Farm, as his insurer, allowed to recover tort damages for purely economic loss—the very type of loss meant to be covered by contracts—the contracts would be meaningless. Renberg and his insurer would receive full warranty protection against purely economic risk in the form of tort damages without having negotiated or paid for that warranty. Renberg would gain much more than that for which he bargained or paid in the purchase price. If Renberg were allowed to recover tort damages for his purely economic loss, Ford would be stripped of

its ability to limit liability by contract. Ford, which thought it limited its liability for economic losses by means of the contract of sale and the extended warranty, would be liable for damages for which it neither bargained nor expected.

¶ 40. State Farm argues that the economic loss doctrine should not apply to consumers because consumers do not have equal bargaining power with manufacturers. However, "[t]he buyer who is not a corporation is not necessarily so poor or unsophisticated as the sacred texts of products liability suggest." 19 Nova L. Rev. at 935. Although there may be situations where the parties' bargaining power is extremely disparate, "relative bargaining power is not the touchstone of the economic loss rule, nor even an element." *Id.* at 957 (in footnote citing *Spring Motors*, 489 A.2d at 670–71; *Greenman v. Yuba Power Products, Inc.*, 377 P.2d 897 (Cal. 1963)). "Perfect parity is not required for a finding of substantially equal bargaining power." *Alloway v. General Marine Ind.*, 695 A.2d 264, 268 (N.J. 1997). In fact, the law of warranty and the U.C.C. are not limited to parties with equal bargaining power. *See Seely*, 403 P.2d at 151. "Such a limitation is not supported by the language or history of the sales act and is unworkable." *Id.*

¶ 41. To apply the economic loss doctrine to commercial entities but not to consumers "would mean one rule for businesses and another for those who buy products from these businesses. The equilibrium could not be stable." 19 Nova L. Rev. at 944 (footnote omitted). Such a rule would assume that commercial entities always have equal bargaining power with each other and that consumers never have equal bargaining power with the manufacturer or producer of the good. This is a nave and over-simplified approach.

¶ 42. In the case before the court, the consumer, Renberg, purchased the vehicle for his personal use. He could have just as easily purchased the same vehicle for his small painting or heavy-duty hauling business, as in *Seely*. Whether the truck was for individual use or for a business, the same scenario could have occurred—Renberg returning to his locked vehicle after completing a job, and finding that a fire had occurred in his truck. Under the approach advocated by State Farm, Renberg as an consumer purchaser, would not be barred by the economic loss doctrine from recovering tort damages. However, Renberg as a small business owner, that is, as a commercial purchaser, would not be able to recover in tort because of the economic loss doctrine. In reality, Renberg as a small business owner has no more equality in bargaining power than does Renberg as an individual.

¶ 43. We recognize that there may be some situations in which the disparate bargaining position between the parties is so great that it would be unconscionable to hold a party to such a contract. This, however, is not one of those cases. There is nothing in the record to indicate that Renberg was forced to purchase the vehicle "as is." He could have purchased another vehicle that came with warranties. It is also likely that he had several options in extended warranties available to him.

¶ 44. Whether in a commercial or consumer setting, there is "no reason to intrude into the parties' allocations of the risk of economic loss and to extricate the parties from their bargains." *Daanen*, 216 Wis. 2d at 410. Because the consumer can allocate his or her economic risk by contract, the policy of protecting par-

ties' freedom to allocate risk through contract applies equally to consumers as to commercial parties.

¶ 45. The third policy that supports applying the economic loss doctrine to commercial transactions is that it encourages the party best situated, usually the purchaser, to assume, allocate or insure against economic risk. *Daanen*, 216 Wis. 2d at 403. The purchaser is in the best position to plan for economic loss because when a defective product injures only itself, the purchaser, not the manufacturer, "stands to lose the value of the product, risks the displeasure of its customers who find that the product does not meet their needs, or. . .experiences increased costs in performing a service. Losses like these can be insured." *East River*, 476 U.S. at 871–72 (citing 10A G. Couch, Cyclopedia of Insurance Law §§ 42:385–42:401, 42:414–417 (2d ed. 1982); 7 E. Benedict, Admiralty, Form No. 1.16–7, p. 1–239 (7th Ed. 1985); 5A J. Appleman & J. Appleman, Insurance Law and Practice § 3252 (1970)).

¶ 46. Only the buyer knows how and where the product will be used and whether it will be used in conjunction with other devices or components. 19 Nova L. Rev. at 939. Because purchasers know their own needs and expectations, they are best suited to protect themselves against economic loss. The manufacturer or intermediate seller usually does not know these things and if it does, its information will come from the buyer. *Id.* As a result, the seller is unable to predict and protect against the severity of economic loss to a particular purchaser. *Id.* The purchaser is in a better position to understand the impact of disappointed economic expectations caused by a defective product. *Daanen,* 216 Wis. 2d at 411. A purchaser can anticipate and assume, allocate, or insure against this risk by agree-

ing to a certain contract of sale, contracting through warranties or purchasing insurance. *Id.* at 412.

¶ 47. This policy of encouraging purchasers to assume, allocate or insure against economic loss really "distills to whether the consuming public as a whole should bear the cost of economic losses sustained by those commercial purchasers who failed to bargain for adequate contract remedies." *Daanen,* 216 Wis. 2d at 412 (citing *Casa Clara v. Charley Toppino and Sons,* 620 So. 2d 1244, 1246 (Fla. 1993)). If a purchaser could recover tort damages for purely economic loss, regardless of any contractual arrangements between the parties, the manufacturer would be liable in tort and therefore forced to assume, allocate or insure against economic risk. A manufacturer would pass this cost on, "forcing the consuming public to bear the very cost the commercial purchaser contractually agreed to forego in exchange for a lower price." *Daanen,* 216 Wis. 2d at 412. Allowing tort damages for purely economic loss

> would transform all manufacturers into insurers with seemingly unlimited tort liability. Consumers would then be forced to subsidize or pay premiums for commercial purchasers who choose not to assume, allocate, or insure against their risk of economic loss. The cost of tort protection for economic expectations ultimately would be borne by society. We do not think that the consuming public as a whole should bear the cost of economic losses sustained by those commercial purchasers who fail to bargain for adequate contract remedies.

*Id.* at 412–13. *See also East River,* 476 U.S. at 872, 874.

¶ 48. In *Daanen,* the plaintiff could have requested an express warranty or that the distributor extend the manufacturer's warranty. *Daanen,* 216 Wis.

2d at 409. It failed to do so. The plaintiff also could have purchased insurance to guard against equipment failure. *Id.* at 412. It apparently failed to do so. Therefore, this court concluded that Daanen could not now benefit from recovering tort damages when it had foregone these contractual protections, probably in exchange for a lower price.

¶ 49. The policy of encouraging the party best situated, usually the purchaser, to assume, allocate or insure against economic loss applies with equal force to consumer transactions. Whether in commercial or consumer transactions, if tort damages were allowed for purely economic losses, manufacturers would become insurers with seemingly unlimited tort liability. *See Daanen*, 216 Wis. 2d at 412. As discussed at oral argument in this case, if tort damages were recoverable for purely economic loss, warranties if offered at all, would have to provide protection to the full extent of tort law. Manufacturers would likely add the increased cost of providing such expansive protection to their product, thereby causing society as a whole to pay for the economic losses of a handful who chose not to bargain for adequate contract remedies. *See id.* "[T]he consuming public [should not have] to pay more for their products so that a manufacturer can insure against the possibility that some of his products will not meet the business needs of some of his customers." *Seely*, 403 P.2d at 151. Purchasers, whether commercial entities or consumers, are in a better position to assess and protect themselves against disappointed economic expectations, and therefore purchase warranties or insurance accordingly.

¶ 50. In the present case, Renberg purchased the Ford Bronco "as is" though it is likely he could have purchased a different vehicle with warranties. As we

335

have noted several times, it is likely that this contract of sale affected the purchase price. Renberg also purchased an extended service warranty. Again, there were likely several options available, some providing more coverage, or for a longer period of time. Finally, Renberg entered into an insurance contract with State Farm, for which he paid a premium in exchange for a certain level of protection from damages. It is likely that he could have received greater protection had he been willing to pay a higher premium. Renberg made his decisions based on his personal knowledge regarding the use of his vehicle and his comfort level with risk. Renberg fulfilled his end of the insurance contract by paying his premiums, and State Farm fulfilled its end of the bargain by paying Renberg's claim regarding the damages to his Ford Bronco.

¶ 51. In sum, Renberg was able to contractually protect himself. As illustrated by this case, the third policy that justifies applying the economic loss doctrine to commercial transactions, that it encourages the party best situated, usually the purchaser, to assume, allocate, or insure against economic risk, applies with equal force to consumer transactions.

¶ 52. For the reasons stated above, the policies that justify applying the economic loss doctrine to commercial transactions apply with equal force to consumer transactions. Whether a commercial or consumer transaction, it is important to maintain the distinction between tort and contract because the two theories serve very different purposes: tort law to protect societal interests in human life, health and safety, and contract law to protect the parties' bargain. Second, whether a commercial or consumer transaction, it is important to protect the parties' freedom to allocate economic risk by contract. Allowing tort recovery for

economic loss would allow an end run around the bargain and provide recovery for which the parties neither bargained nor expected. Finally, whether a commercial or consumer transaction, it is important to encourage the party best situated, usually the purchaser, to assume, allocate, or insure against economic risk. Only the purchaser, not the manufacturer, can appreciate the severity of the consequences of an economic loss and thereby contract accordingly. Our review of the three policies that justify applying the economic loss doctrine to commercial transactions convinces us that these policies apply with equal force to consumer transactions.

¶ 53. A majority of courts in other jurisdictions have also applied the economic loss doctrine to consumer transactions by relying on the same policies used by this court to apply the economic loss doctrine to commercial transactions.[5] For example, like this court

[5] *See Wellcraft Marine v. Zarzour*, 577 So. 2d 414 (Ala. 1990) (under Alabama's extended manufacturer's liability doctrine, no recovery for damage to product itself regardless of whether product is sold to consumer or commercial buyer); *Pratt & Whitney Canada, Inc. v. Sheehan*, 852 P.2d 1173 (Alaska 1993) (distinguishing between consumers and commercial buyers is problematic and this court rejected such distinction); *Danforth v. Acorn Structures, Inc.*, 608 A.2d 1194 (Del. 1992) (rejected homeowner's contention that economic loss doctrine should not apply to consumers purchasers as opposed to commercial purchasers. Such a rule would defeat the legislative intent in enacting the Uniform Commercial Code); *Casa Clara Condominium Assoc., Inc. v. Charley Toppino and Sons, Inc.*, 620 So. 2d 1244 (Fla. 1993); *Chrysler Corp. v. Taylor*, 234 S.E.2d 123 (Ga. Ct. App. 1977) (purchaser of car must sue under warranty law, not strict liability or negligence, for loss of benefit of the bargain); *State Farm Mutual Automobile Ins. Co. v. Ford Motor Company*, 572 N.W.2d 321 (Minn. Ct. App. 1997) (economic loss

337

in *Sunnyslope* and *Daanen* and the United States Supreme Court in *East River*, the Delaware Supreme Court relied on the first policy, the distinction between tort and contract law, to reject an exception to the economic loss doctrine for consumers.

> The rationale underlying the economic loss doctrine is best understood by considering the distinct functions served by tort law and contract law. . . .Products-liability tort law has evolved to protect the individual and his property from the risk of physical harm posed by dangerous products. Con-

doctrine applies to consumers; fire damage to automobile resulted in purely economic loss and recoverable only in contract); *Alloway v. General Marine Industries*, 695 A.2d 264, 270–71 (N.J. 1997); *Jandreau v. Sheesley Plumbing & Heating Co.*, 324 N.W.2d 266 (S.D. 1982) (regarding privity, absent the commercial or consumer purchaser's ability to show reliance on express representations by the remote seller, most courts hold that a non-privity buyer cannot recover for direct economic loss on either an express or an implied warranty theory); *Ritter v. Custom Chemicides, Inc.*, 912 S.W.2d 128 (Tenn. 1995) (the consumer does not have an action in tort for economic damages caused by product's failure to protect tomato crop from frost damage as promised on the label); *Nobility Homes of Texas, Inc. v. Shivers*, 557 S.W.2d 77 (Tex. 1977) (strict liability inapplicable to action by purchaser of mobile home to recover economic losses); *Paquette v. Deer & Co.*, 719 A.2d 410 (Vt. 1998) (no distinction in application of economic loss doctrine between consumers and commercial entities; reduced value in motor home because of defective wiring and related problems is purely economic loss and recoverable only in contract); *Berschauer/Phillips Construction Co. v. Seattle School District No. 1*, 881 P.2d 986 (Wash. 1994) (applied the economic loss doctrine to a general contractor, a "sophisticated consumer," because the legislature deprived the unsophisticated consumer of economic damages under the WPLA).

338

tract-warranty law has evolved to protect a different interest: *viz.*, the "bargained for expectations" of both contracting parties and other foreseeable users who suffer loss when a product fails to meet the qualitative expectations of a consumer, i.e., when a product is unfit for its intended use.

*Danforth v. Acorn Structures, Inc.*, 608 A.2d 1194, 1195–96 (Del. 1992) (citations and footnotes omitted). *See also Casa Clara*, 620 So. 2d at 1246–47.

¶ 54. Courts in other jurisdictions have also relied on the second policy, recognizing that, like commercial parties, consumers must be free to allocate risk by contract. "The [economic loss] rule remains the same, regardless of the nature of the customer: 'A defective product is a loss of the benefit of the bargain which is a contract rather than a tort action.'" *Wellcraft Marine v. Zarzour*, 577 So. 2d 414, 418 (Ala. 1990) (quoting *Dairyland Ins. Co. v. General Motors Corp.*, 549 So. 2d 44, 46 (Ala. 1989)). The availability of warranties, statutory duties imposed on sellers, the consumer's ability to inspect goods before purchase and to bargain over price all provide protections to the consumer. *See Casa Clara*, 620 So. 2d at 1247. "[T]hese protections must be viewed as sufficient when compared with the mischief that could be caused by allowing tort recovery for purely economic losses." *Id.* (footnote omitted).

¶ 55. Other jurisdictions have also applied the economic loss doctrine to consumer transactions because, like the third policy, the party best situated to assess the risk of economic loss, usually the purchaser, should be encouraged to assume, allocate or insure against that risk. "[M]any buyers insure against the risk of the purchase of defective goods either directly

through the purchase of an insurance policy,. . .or through insurance provided indirectly through many credit card purchases." *Alloway*, 695 A.2d at 275.

¶ 56. State Farm points to jurisdictions where the court did not apply the economic loss doctrine to consumer transactions. We are not persuaded by these cases. First, the courts which have held the economic loss doctrine does not apply to consumers are in the minority. *See Alloway*, 695 A.2d at 271 (referring to *Sharon Steel Corp. v. Lakeshore, Inc.*, 753 F.2d 851, 855–56 (10th Cir. 1985) (regarding New Mexico law); *Cova v. Harley Davidson Motor Co.*, 182 N.W.2d 800, 804 (Mich. App. 1970); *City of LaCrosse v. Schubert, Schroeder & Assoc.*, 72 Wis. 2d 38, 240 N.W.2d 124, 127 (1976) [overruled by *Daanen*, 216 Wis. 2d at 416]; *Lloyd F. Smith Co. v. Den-Tal-Ez, Inc.*, 491 N.W.2d 11, 17 (Minn. 1992)).

¶ 57. Also, the strength of this minority group of cases is questionable because many of the cases on which they relied to not apply the economic loss doctrine to consumers have since been overruled or questioned. For example, in *Thompson v. Nebraska Mobile Homes Corp.*, 647 P.2d 334 (Mont. 1982) the court did not apply the economic loss doctrine to a consumer transaction, reasoning that the consumer had an unfair bargaining position with respect to the manufacturer. *Thompson*, 647 P.2d at 337. The court noted that its holding was consistent with cases in several other states including Wisconsin, relying on *City of LaCrosse*, 72 Wis. 2d at 38. However, *LaCrosse* was first limited by this court in *Sunnyslope*, 148 Wis. 2d at 917, in 1989, and then expressly overruled in 1998 in *Daanen*, 216 Wis. 2d at 416. Similarly, State Farm and the dissent's reliance on *Thompson* stands on shaky ground because most of the cases relied on by the

340

*Thompson* court have been questioned or limited in some fashion.[6]

¶ 58. Further support for our holding is found in the Restatement (Third) of Torts: Products Liability § 21 (1998) which follows the majority of jurisdictions and excludes tort recovery for damage only to the defective product itself. When a party suffers "pure economic loss" recovery is more appropriately determined by contract law and the remedies set forth in the U.C.C. Restatement (Third) Torts: Products Liability § 21 cmt. a. "When a product defect results in harm to the product itself, the law governing commercial transactions sets forth a comprehensive scheme governing the rights of the buyer and seller." *Id.* cmt. d.[7]

---

[6] Following is the history of cases relied on in *Thompson v. Nebraska Mobile Homes, Corp.*, 647 P.2d 334, 337 (Mont. 1982): *Hiigel v. General Motors Corp.*, 544 P.2d 983 (Colo. 1975) was limited by *Richard O'Brien Cos. V. Challenge-Cook Bros. Inc.*, 672 F. Supp. 466 (D. Colo. 1987); *Santor v. A and M Karagheusian, Inc.*, 207 A.2d 305 (N.J. 1965) was questioned in *East River Steamship Corp v. Transamerica Delaval, Inc.*, 476 U.S. 858, 870 (1986); *City of La Crosse v. Schubert, Schroeder and Associates*, 72 Wis. 2d 38, 240 N.W.2d 124 (1976) was overruled by *Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 216 Wis. 2d 394, 416, 573 N.W.2d 842 (1998); *Superwood Corp. v. Siempelkamp Corp.*, 311 N.W.2d 159 (Minn. 1981) was overruled by *Hapka v. Paquin Farms*, 458 N.W.2d 683 (Minn. 1990). Only *Gautheir v. Mayo*, 258 N.W.2d 748 (Mich. App. 1977) and *C&S Fuel, Inc. v. Clark Equipment Co.*, 524 F. Supp. 949 (E.D. Ky. 1981), both cited in *Thompson* as support for not extending the economic loss doctrine to consumers, have no negative history.

[7] The dissent argues that an argument can be made for applying products liability law in this case. Dissent at 352. Although the Restatement recognizes that there is a "plausible argument" for relying on strict products liability law when a product poses a danger, contrary to the dissent's implication,

¶ 59. Additional support for our holding is found in the protections afforded consumers under the U.C.C., the lemon law, warranties, and insurance.

¶ 60. The legislature adopted the U.C.C. in 1963, effective July 1, 1965. *See* Ch. 158, Laws of 1963. "Once the Legislature acts, respect for it as a co-equal branch of government requires courts to consider the legislation in determining the limits of judicial action." *Alloway*, 695 A.2d at 268 (citing *Spring Motors*, 489 A.2d at 671; *see also Danforth*, 608 A.2d at 1200–01 (declining to displace provisions of the U.C.C. with tort actions)). "[T]he legislative protections granted by the Uniform Commercial Code are not to be buttressed by tort principles and recovery." *Sunnyslope*, 148 Wis. 2d at 916 (citing *Spring Motors*, 489 A.2d at 673). The U.C.C. provides a "comprehensive system for compensating consumers for economic loss arising from the purchase of defective products." *Alloway*, 695 A.2d at 268.

¶ 61. Protection against damages caused by a defective product injuring only itself is the purpose of express and implied warranties provided for in the U.C.C. *See East River*, 476 U.S. at 872. When a product fails to operate as warranted or as a consumer expected, the proper avenue for relief is a breach-of-warranty claim. *Id.* "Or, if the customer prefers, it can reject the product or revoke its acceptance and sue for breach of contract." *Id.* (citing U.C.C. §§ 2–601, 2–608, 2–612). Regardless, the U.C.C. has built-in protections for both the purchaser and manufacturer.

dissent at 352, the Restatement nonetheless concludes that the Uniform Commercial Code provides the appropriate remedy when a plaintiff suffers only economic loss. Restatement (Third) Torts: Products Liability § 21 cmt. d at 295, cmt. a at 293.

¶ 62. Purchasers are able to recover repair costs and lost profits, thus putting the purchaser in the same position as if the product functioned properly. *See East River*, 476 U.S. at 873. "The expectation damages available in warranty for purely economic loss give a plaintiff the full benefit of its bargain by compensating for forgone business opportunities." *Id.* (citing Fuller & Perdue, *The Reliance Interest in Contract Damages*: 1, 46 Yale L.J. 52, 60–63 (1936); R. Posner, *Economic Analysis of Law* § 4.8 (3d ed. 1986)).

¶ 63. The U.C.C. also provides protections for manufacturers. By terms of a contract, a manufacturer can restrict its liability, within reason, by disclaiming warranties or limiting remedies. *See East River*, 476 U.S. at 873. In exchange, the purchaser likely pays a lower price. *Id.* "The limitation in a contract action comes from the agreement of the parties and the requirement that consequential damages, such as lost profits, be a foreseeable result of the breach." *Id.* at 874 (referring to *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng. Rep. 145 (1854)).

¶ 64. State Farm cites Wis. Stat. § 401.102 for its argument that the U.C.C. applies only to commercial transactions. The statute provides that the underlying purposes of the U.C.C. are "(a) To simplify, clarify and modernize the law governing commercial transactions; (b) To permit the continued expansion of commercial practices through custom, usage and agreement of the parties . . . ." Wis. Stat. § 401.102. Despite these references to "commercial transactions" and "commercial practices," nowhere does the U.C.C. indicate that "consumers as a group are to be excluded from the class of buyers whose rights may be limited under that section." Note, 66 Colum. L. Rev. at 961 (referring to U.C.C. § 2–316). Although a court may invalidate a

manufacturer's disclaimer as unconscionable, the U.C.C. does not purport to hold that disclaimers directed to consumers are unconscionable per se. Note, 66 Colum. L. Rev. at 961; 19 Nova L. Rev. at 943; U.C.C. § 2–302.

¶ 65. Furthermore, the U.C.C. "devotes explicit attention to the subject of sales to ultimate consumers. [footnote referring to U.C.C. § 2–318, comments 2 and 3]. This renders feeble any argument that the Code's drafters intended to deal only with businessmen and to leave ultimate consumers to be regulated by tort law." Marc A. Franklin, *When Worlds Collide: Liability Theories and Disclaimers in Defective-Product Cases*, 18 Stan. L. Rev. 974, 995 (1966) (footnote omitted). "The U.C.C. governs the allocation of risk between the consumer purchaser and the seller just as it does between the commercial purchaser and the seller, and it imposes warranties upon the transaction even where the transaction is devoid of expressed warranty provisions." 26 U. Tol. L. Rev. at 598 (citing U.C.C. §§ 2–314, 2–315 (1977)).

¶ 66. Some consumer transactions may be governed by the Wisconsin Consumer Act contained in Wis. Stat. chs. 421 to 427. Wis. Stat. § 421.101. However, "[u]nless superseded by the particular provisions of chs. 421 to 427 parties to a consumer transaction have all of the obligations, duties, rights and remedies provided in chs. 401 to 411 [the U.C.C.] which apply to the transaction." Wis. Stat. § 421.103(3). The parties have not argued nor can we discern any provision of the Consumer Act that would supersede the obligations, duties, rights and remedies applicable to the purchase of an automobile provided in the U.C.C.

¶ 67. State Farm also ignores the many cases that have applied the U.C.C. to consumer transactions.

*See, e.g., Ewers v. Eisenzopf*, 88 Wis. 2d 482, 276 N.W.2d 802 (1979); *Murray v. Holiday Rambler, Inc.*, 83 Wis. 2d 406, 265 N.W.2d 513 (1978); *Gerner v. Vasby*, 75 Wis. 2d 660, 250 N.W.2d 319 (1977). *See also* Daniel E. Murray, *The Consumer and the Code: A Cross-Sectional View*, 23 U. Miami L. Rev. 11 (1968); Orrin L. Helstad, *The Impact of the Uniform Commercial Code on Wisconsin Law*, 1964 Wis. L. Rev. 355, 364 (1964). In fact, the U.C.C. has specifically been applied to the purchase of motor vehicles made by individual consumers. *See Hughes v. Chrysler Motors Corp.*, 197 Wis. 2d 973, 979, 542 N.W.2d 148 (1996) ("Prior to the enactment of lemon laws, the only kinds of remedial relief available to consumers were the statutory remedies of revocation of acceptance and breach of warranty under the Uniform Commercial Code."); *Taterka v. Ford Motor Co.*, 86 Wis. 2d 140, 271 N.W.2d 653 (1978) (applying several U.C.C. provisions to consumer's demand to Ford to repair latent defect in the taillight assembly gaskets); and *Northwestern Motor Car, Inc. v. Pope*, 51 Wis. 2d 292, 187 N.W.2d 200 (1971) (regarding liquidated damages under Wis. Stat. § 402.718(1) in automobile purchase contract).

¶ 68. In addition to the legislative protections afforded consumers by the U.C.C., the legislature enacted the lemon law to provide further protections from economic loss. Wisconsin's lemon law, Wis. Stat. § 218.015, was enacted "to 'improve auto manufacturers' quality control. . .[and] reduce the inconvenience, the expense, the frustration, the fear and [the] emotional trauma that lemon owners endure.' " *Hughes*, 197 Wis. 2d at 982 (quoting Statement by Vernon Holschbach, co-sponsor of the bill, *"Lemon" Car Bill Has Sweet, Sour Sides*, Wisconsin State Journal, March 2, 1983). If a consumer has purchased a vehicle

that does not function properly and the seller is unwilling or unable to remedy the situation, the consumer has recourse under the lemon law. *Hughes*, 197 Wis. 2d at 979–80.

> Wisconsin's lemon law provides that if a new motor vehicle does not conform to an applicable express warranty, the nonconformity shall be repaired before the expiration of the warranty or one year after delivery of the vehicle, whichever is sooner. Section 218.015(2)(a). If the nonconformity is not repaired after a reasonable attempt to repair, the manufacturer must accept return of the vehicle, and at the direction of the consumer, either replace the vehicle or refund to the consumer the full purchase price plus any sales tax, finance charge, costs, less a reasonable allowance for use. Section 218.015(2)(b)1 and 2. A reasonable attempt to repair means either that the nonconformity is subject to repair four times and the nonconformity continues or that the vehicle is out of service for an aggregate of at least 30 days because of warranty nonconformities. Section 218.015(1)(h)1 and 2.

*Id.* at 981. If the automobile manufacturer refuses to voluntarily replace or repurchase a lemon vehicle as demanded by the consumer, the manufacturer violates the lemon law, and the remedies of § 218.015(7) are available. *Id.*

¶ 69. In addition to the legislative protections of the U.C.C. and the lemon law afforded consumers, a consumer purchaser, just as a commercial purchaser, can usually choose whether to purchase a product on the terms offered. Consumers are also able to inspect goods before purchase, negotiate over the price of a product, and "shop around" for the best deal. "The consumer is just as free to find a seller willing to provide

greater warranties, and to decide whether he or she wishes to pay for greater warranties." 26 U. Tol. L. Rev. at 599. The consumer is free to accept the basic warranty, or pay the price of an extended warranty to avoid the risk of product failure for an extended period. *Id.*

¶ 70. "In short, a seller simply does not owe a *tort* duty to supply a product that will meet the buyer's economic expectations." 26 U. Tol. L. Rev. at 599. Express and implied warranties in contract law and the U.C.C. provide the exclusive remedy for disappointed purchasers, whether consumers or commercial entities. *Id.* Consumers also have protections under the lemon law, insurance and the ability to inspect goods, negotiate over price and "shop around." If consumers were allowed tort recovery for purely economic loss, "tort law would forever be used to trump contract law and render the parties' bargains and the careful allocation of duties and risks in the U.C.C. meaningless. Contract law—not tort law—governs a plaintiff's claims for solely economic losses." *Id.*

¶ 71. State Farm finally argues that the fact that Renberg purchased an insurance policy should make no difference in our analysis or treatment of this case. State Farm argues that this is a subrogation action, and therefore State Farm stands in the shoes of Renberg. State Farm also asserts that subrogation is an equitable doctrine whereby the party liable for a defective product should pay the debt satisfied by another in order to avoid unjust enrichment. We are not persuaded by State Farm's subrogation argument.

¶ 72. Subrogation rights derive from the injured party's right to recover from the wrong-doer. *American Standard Ins. Co. v. Cleveland*, 124 Wis. 2d 258, 262, 369 N.W.2d 168 (Ct. App. 1985). *See also Cunningham*

*v. Metropolitan Life Ins. Co.*, 121 Wis. 2d 437, 443–44, 360 N.W.2d 33 (1985) (citing 1 G.E. Palmer, *Law of Restitution* sec. 1.5(b) (1978)). "The original right of the [injured party] measures the extent of the subrogated party's right. [citation omitted] Unless the [injured party] has a right to recover from the tortfeasor, no issue of subrogation arises." *American Standard*, 124 Wis. 2d at 262 (citation omitted).

¶ 73. Because we have determined that the injured party, in this case Renberg, does not have a legal right against Ford for his purely economic loss because his damages are barred by the economic loss doctrine, neither does State Farm have a legal right of recovery as a subrogated party. No issue of subrogation arises because the injured party, Renberg, has no right to recover tort damages from Ford.

¶ 74. In sum, we hold that the economic loss doctrine applies to consumer transactions to bar tort recovery for purely economic loss. The same policies that justify applying the economic loss doctrine to commercial transactions apply with equal force to consumer transactions. Additionally, like commercial entities, consumers have many protections available against economic loss. Therefore, State Farm's tort claims for purely economic loss are barred. We make one note of caution. Like the New Jersey Supreme Court, "we do not reach the issue of the preclusion of a strict-liability claim when the parties are of unequal bargaining power, the product is a necessity, no alternative source for the product is readily available, and the purchaser cannot reasonably insure against consequential damages." *Alloway*, 695 A.2d at 273. None of these concerns are present in this case. That is a different case for a different time.

*By the Court.*—The order of the circuit court is affirmed.

¶ 75. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE (*dissenting*). In this case the consumer bought a Ford Bronco "as is" and also entered into a warranty contract with Ford Motor Company, the manufacturer. After the warranty ended, the Bronco caught on fire, allegedly because of a manufacturing defect in the ignition switch. Subsequently, the consumer's insurer, State Farm, paid the fair market value of the Bronco and brought this subrogation suit in which it "stepped into the shoes" of the consumer for purposes of seeking reimbursement. The majority opinion, however, does not limit its holding to the circumstances presented in this case, but instead broadly holds "that the economic loss doctrine applies to consumer transactions and bars State Farm's tort claims for purely economic loss." Majority op. at 311–12.

¶ 76. After an extensive discussion attempting to justify its holding that the economic loss doctrine applies to all consumer transactions, the majority opinion itself admits that its holding is too broad. In the final paragraph of this lengthy decision, the majority quotes *Alloway v. General Marine Industries*, 695 A. 2d 264, 273 (N.J. 1997), in cautioning that "we do not reach the issue of the preclusion of a strict-liability claim when the parties are of unequal bargaining power, the product is a necessity, no alternative source for the product is readily available, and the purchaser cannot reasonably insure against consequential damages." A reader can only conclude that the majority opinion is not really holding that the economic loss doctrine applies to all consumer transactions. Yet the reader does not know which consumer transactions are

excepted from the new rule because the very factors about which the majority opinion cautions are present in this case.

¶ 77. Although the majority opinion relies heavily on the *Alloway* case, the New Jersey Supreme Court in *Alloway* expressly refused to resolve the issue presented by the facts of this case. The New Jersey Supreme Court stated:

> An unresolved issue is whether the U.C.C. or tort law should apply when a defective product poses a serious risk to other property or persons, but has caused only economic loss to the product itself. In the present case, plaintiffs have not alleged that the defective seam in the boat posed such a risk. Hence we do not resolve the issue.

*Alloway*, 695 A.2d at 273.

¶ 78. The majority opinion also relies on *Trans States Airlines v. Pratt & Whitney Canada*, 682 N.E.2d 45 (Ill. 1997), which like *Alloway,* involves a commercial transaction, not a consumer transaction as in this case. *Trans States*, like *Alloway*, expressed no opinion on whether "the consumer/commercial transaction distinction makes any difference when the product damages only itself." *See Trans States*, 682 N.E.2d at 54.

¶ 79. I would allow the consumer in this case to proceed to trial under the doctrine of strict product liability for the damage claimed, that is, the injury to the defective product itself. This case involves an allegedly defective product that poses an unreasonable risk of harm to person and property. Strict product liability law is grounded on policies of safety and risk-spreading. The theory is that manufacturers will use greater care if they are liable for defective products. Safety

concerns are not reduced when the injury is only to the product itself.

¶ 80. A manufacturer's duty to market safe products should not depend on whether the full extent of personal or property injury actually happens. When defective products present a risk of harm, it is purely fortuitous that the resulting damage is only to the product itself. I can find no distinction for imposing different liability upon a manufacturer whose defective product causes a consumer to suffer personal injury or property damage and a manufacturer whose defective product presents an identical safety risk to the consumer but happens by chance to result only in damage to the product itself. The manufacturer remains in the best position to avoid injury to the product itself and to absorb the damage to the product itself.

¶ 81. In this case, I would adopt the reasoning of the Supreme Court of Montana in a case similar to the case at bar:

> The public remains in an unfair bargaining position as compared to the manufacturer. In the case of damage arising only out of loss of the product, this inequality in bargaining position becomes more pronounced. Warranties are easily disclaimed. Negligence is difficult, if not impossible, to prove. The consumer does not generally have large damages to attract the attention of lawyers who must handle these cases on a contingent fee. We feel that the consumer should be protected by affording a legal remedy which causes the manufacturer to bear the cost of its own defective products.

*Thompson v. Nebraska Mobile Homes Corp.*, 647 P.2d 334, 337 (Mont. 1982). *See also Oklahoma Gas & Elec. Co.*, 834 P.2d 980, 982–85 (Okla. 1992) (Wilson, Opala and Kauger, JJ., dissenting); Jay M ZZitter, *Strict*

*Products Liability: Recovery for Damage to Products Alone,* 72 A.L.R. 4th (1989).

¶ 82.　The *Restatement* similarly recognizes that under the circumstances presented in this case a good argument can be made for applying products liability law. *See Restatement (Third) of Torts: Products Liability* § 21 (1997) (regarding harm to the defective product itself, "a plausible argument can be made that products that are dangerous, rather than merely ineffectual, should be governed by the rules governing products liability law," comment d. to § 21 at p. 294) (Reporters' Note and numerous cases cited at § 21 at p. 304).

¶ 83.　I need not decide in this case any other issues presented under the economic loss doctrine.

¶ 84.　For the reasons set forth, I dissent.

¶ 85.　I am authorized to state that JUSTICE ANN WALSH BRADLEY joins this dissent.